DISTRICT OF UTAH - CENTRAL DIVISION

THE UNITED STATES DISTRICT COURT

| | |
|---|---|
| MARK D. ALBRIGHT, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> ATTORNEY'S TITLE INSURANCE FUND, et al., <br><br> Defendants. | **MEMORANDUM OPINION AND ORDER** <br><br> Case No. 2:03CV00517 <br> Judge Dee Benson |

Defendants Attorneys' Title Insurance Fund, a business trust, and Attorneys' Title Insurance Fund, Inc. (collectively "the Florida Fund") have filed a motion for partial summary judgment asking this Court to eliminate plaintiffs' claims based on theories of racketeering ("RICO"), civil conspiracy, and alter-ego.  Having considered the parties' arguments and the relevant law, the Court now issues the following memorandum opinion and order.

## I.  BACKGROUND

The plaintiffs in these consolidated cases are among a group of individuals who lost money in fraudulent investments and real estate transactions orchestrated by individuals who were agents of Attorneys' Title Guarantee Fund ("ATGF") in Utah.  Originally, this lawsuit was filed against fifty-five different defendants and contained forty-four different claims.  The number of claims currently stands at eighteen, and plaintiffs have settled with, dismissed, or decided not to pursue claims against all but two defendants–the Florida Fund (the majority owner of ATGF) and Cohen Fox, P.A., a Florida law firm.  In its motion for partial summary judgment, the Florida Fund seeks to eliminate only plaintiffs' claims based on RICO, conspiracy, and alter-

ego.  This motion does not seek dismissal of the plaintiffs' twelve remaining claims against the Florida Fund, which are based on fraud, conversion, breach of fiduciary duty, insurance code violations, negligence, breach of insurance contracts, promissory estoppel, accounting and constructive trust, imputation, and fraudulent concealment.  (See Second. Am. Compl. at x-xi.)

Because this case is before the Court on a motion for partial summary judgment, the Court examines the evidence in the light most favorable to the non-moving party.  The factual allegations set forth here do not constitute findings by the Court.

### The Florida Fund and ATGF

The Florida Fund is a title insurance underwriter that has been in business in Florida since 1947.  It also does business in Georgia, Illinois, Minnesota, Maryland, North Carolina, South Carolina, Indiana, North Dakota, Alabama, Arkansas, Michigan, and Puerto Rico.  (Defs.' Mem. in Supp. S.J. at 7.)  The Florida Fund is a bar-related title insurance company, which means that it issues title insurance policies through licensed attorneys who supplement their law practices with title insurance services.  The Florida Fund also is a reinsurer for bar-related and non-bar related title insurance companies throughout the country, including ATGF in Utah.  (Id.)

ATGF was a established as a title insurance company in Colorado in 1960.  Since that time, ATGF has expanded into Utah and Minnesota.  Like the Florida Fund, ATGF is a bar-related title insurance company that issues title insurance policies through its lawyer agents.  In 1989, the Florida Fund entered into a reinsurance contract with ATGF.  (Pls.' Ex. 10, Reinsurance Treaty.)  Pursuant to the Reinsurance Treaty in force at all times relevant to this dispute, ATGF's primary retention was $100,000 per policy and the Florida Fund was obligated to pay all amounts above $100,000, to a maximum of $7,000,000, for each valid claim against an ATGF title insurance policy.  The Reinsurance Treaty also provides that the Florida Fund is not

obligated to reinsure losses of ATGF's policyholders resulting from agent fraud.  (Pls.' Ex. 10, Reinsurance Treaty § 3.2.)

The Florida Fund and ATGF operated as independent entities until 1996 when the Florida Fund bought stock in ATGF.  (Defs.' Mem. in Supp. S.J. at 5.)  Since 1996, the Florida Fund and ATGF have engaged in a number of stock transactions, which today leave the Florida Fund owning approximately eighty-two percent of ATGF stock.  (Id. at 8.)

Consistent with its majority ownership interest, the Florida Fund controls a majority of the seats on the ATGF board of directors.  Seven of the thirteen seats on the ATGF board belong to the Florida Fund.  At all times relevant to this case, Charles Kovaleski, President of the Florida Fund, has simultaneously served as chairman of ATGF's board.  As chairman of ATGF's board, Kovaleski had general authority over the business affairs of ATGF subject to control by the board.  (Pls.' Opp'n. to S.J. at 49.)  At all times relevant to this case, Brian Coleman was ATGF's Executive Vice President, and the highest ranking ATGF officer in Utah.  (Pls.' Ex. 55, Harrison Dep. ¶ 6.)  In that capacity, Coleman supervised and directed the activities of ATGF agents in Utah.  (Id.)

ATGF received premiums from the issuance of ATGF title insurance policies, but did not receive any money as a result of the closing or escrow functions performed by agents or their employees.  (Defs.' Ex. 4, Coleman Dep. at 303-04, 337-38; Defs.' Ex. 1, Jones Decl. ¶ 7.)  Similarly, the Florida Fund received a portion of the insurance premiums from ATGF as provided in the Reinsurance Treaty, but did not receive any money from ATGF related to closing or escrow services performed by ATGF agents or their employees.  (Defs.' Ex. 1, Jones Decl. ¶ 7.)

The Florida Fund and ATGF have separate offices, employees, and business operations.

(Defs.' Ex. 3, Zschau Dep. at 83-91; Defs.' Ex . 4, Coleman Dep. at 253; Defs.' Ex. 5, Ritchey Dep. at 77-80.)

**The Frauds In General**

Between 1999 and 2001, the time relevant to this litigation, ATGF had approximately seventy-five to ninety agents operating in Utah.  (Defs.' Ex. 4, Coleman Dep. at 97.)  Included among those agents were Bryan Robinson, Clay Harrison and Dale McAllister.[1]  Like many other ATGF agents, in addition to issuing title insurance policies, these three agents also performed closing and escrow functions for real estate transactions, including purchase-sale transactions and refinancing transactions.  However, unlike other ATGF agents, Robinson, Harrison and McAllister were, under the guise of legitimate real estate transactions, systematically and regularly misappropriating money from unwitting victims through various fraudulent real estate schemes.

The ninety-four plaintiffs in this case are individuals who lost money as a result of approximately fifty-eight separate fraudulent real estate transactions.  Although each of the fraudulent real estate deals took a slightly different form and was perpetrated often by different individuals,[2] for the purpose of simplicity, the frauds can generally be separated into two categories: (1) placement agreements, and (2) mortgage stacking and/or equity/escrow theft.  (Second Am. Compl. at 46-189; Defs.' Ex. 2, Liability Analysis at 35.)

---

[1]Dale McAllister was a closing and escrow officer who worked for Clay Harrison in Harrison's office.  Harrison and McAllister, working together, defrauded the overwhelming majority of plaintiffs in this case.  Bryan Robinson operated an independent office and was not affiliated with Harrison and McAllister.  Only one plaintiff, Triton Funding, is a victim of a Robinson fraud.

[2]Robinson, Harrison and McAllister were assisted in their fraudulent efforts by a variety of attorneys, escrow company personnel, mortgage brokers, and individual investors.  (Second Am. Compl. ¶ 200.)

The vast majority of the plaintiffs either sold or refinanced homes and then invested part of the proceeds in so-called "placement agreements." (Defs.' Ex. 2, Liability Analysis at 37-39.) Pursuant to the placement agreements, plaintiffs' money was supposed to be held in an escrow or trust account for a period of time, often two or three years and sometimes indefinitely. (Defs' Mem. in Supp. S.J. at 9.) The plaintiffs were to receive high interest rates and were told they could redeem the full principal balance at any time during the period of the placement. (Id.) In addition, victims were often told their entire mortgages, amortized over thirty years, would be paid off within two years. However, rather than holding plaintiffs' money in an escrow or trust account, the agents stole plaintiffs' money.

A much smaller group of plaintiffs lost their money through the more conventional title agent fraud of mortgage stacking. In these cases, the agent would falsely represent encumbrances on a piece of real property to induce a new lender to loan money secured by that property or the agent would fail to pay off a senior encumbrance when a new loan was secured by a parcel of real property. (Id.; see also Defs.' Mem. in Supp. S.J. at 10.)

Some of the victims of these frauds had title insurance through ATGF and were paid under their insurance policies. (Mem. Objecting to Order Granting Mot. to Compel at 4-5.) However, many fraud victims, particularly those who lost money through placement agreements, did not have title insurance claims of any kind.[3] In fact, of the fifty-eight transactions involved in this case, forty eight of them involve plaintiffs who were sellers or refinancers who would not have been expected to be covered by title insurance, while it is typically only purchased by buyers and lenders. (Tr. of S.J. Oral Argument at 14 (providing that "with very few exceptions"

---

[3]Because the placement agreement scheme involved the plaintiffs' *sale* or *refinance* of real estate rather than the *purchase* of real estate, title insurance was not involved.

these plaintiffs "not only do not have title insurance from ATGF, but they have no possible basis for claiming the existence of title coverage that would benefit them").)

Originally, the plaintiffs sued fifty-five different defendants, including ATGF and many of the actual perpetrators of the frauds.  As a result of settlements, default judgments, and a variety of other reasons,[4] plaintiffs now are pursuing only two: the Florida Fund and the law firm of Cohen Fox.  (Mem. Objecting to Order Granting Mot. to Compel at 5.)  While plaintiffs have not alleged that the Florida Fund directly induced the fraudulent real estate investments or received the actual money that was stolen through the fraudulent transactions, plaintiffs claim that the Florida Fund is directly liable for their losses under theories of racketeering, civil conspiracy and alter-ego.

Plaintiffs concede, however, that in order to hold the Florida Fund responsible for the actions of Harrison, McAllister and Robinson, there must be some connection or link between the Florida Fund and the underlying fraudulent actions of these rogue agents.  (Tr. of S.J. Oral Argument at 101.)  In an attempt to establish this critical link, plaintiffs have presented a remarkable volume of alleged facts and legal arguments.  Their brief in opposition to the defendants' motion covers 204 pages, 139 of which are devoted to a recitation of alleged "facts."  At first blush, this large volume appears to include a significant amount of pertinent information that may well connect the Florida Fund to the underlying frauds sufficient to allow plaintiffs' RICO and conspiracy claims to go to a jury.  On closer examination, however, and after a full day of oral argument, the alleged factual predicates begin to break down, and more and more alleged facts are exposed as unsupported legal conclusions.  The phrase "this shows the Florida

---

[4]ATGF agents Robinson, Harrison and McAllister were each criminally prosecuted for crimes in connection with the fraudulent activities alleged in plaintiffs' complaint.  (Second Am. Compl. at 27-28.)

Fund knew about, participated in, and aided and abetted the fraud scheme," or a close variation on that theme is repeated over and over again, apparently on the assumption that if repeated often enough it will gain underlying factual support.  In the end, however, after an in-depth examination of the alleged bases for plaintiffs' factual assumptions, the Court is satisfied there are insufficient facts to support plaintiffs' RICO, conspiracy and alter ego claims.  Once the plaintiffs' conclusions are separated from actual facts, there remains no factual basis upon which a reasonable jury could find the Florida Fund's actions constituted racketeering as defined by RICO.  Plaintiffs' counsel have been commendably forthright in acknowledging that in order to state a RICO claim against the Florida Fund they must identify a direct link between the underlying frauds of Robinson, Harrison and McAllister and the knowing participation of the Florida Fund.  This, no matter how skillfully plaintiffs' counsel tries to argue the facts, plaintiffs are unable to do.

**Chronology of Events**

Harrison's Operations

Attorney Clay Harrison was an ATGF agent who employed three closing and escrow officers.  One of these officers was Dale McAllister.  (Pls.' Opp'n to Summ. J. at 64.)  In late 1999 or early 2000, Coleman noticed some unusual transactions involving McAllister out of Harrison's office.  Coleman noticed that McAllister was listed as a buyer on numerous properties and he wondered if McAllister was closing his own deals.  (Pls.' Ex. 58, Harrison Dep. at 320.)  When Coleman asked Harrison about the situation, Harrison explained that McAllister was getting into the landlord business, and he was trying to "get deals on properties and build equity."  (Id. at 321.)

In March of 2000, Coleman received a phone call directing his attention to an unusual

escrow agreement or "placement agreement" bearing ATGF's name, that was set to close in Harrison's office.  Concerned over the fact the agreement had ATGF's name on it as "holding money," Coleman asked Harrison to explain the transaction.  (Pls.' Ex. 55, Harrison Aff. at 6-7; Pls.' Ex. 58, Harrison Dep. at 217; Pls.' Ex. 59, Coleman Dep. at 175-76.)  Harrison said he did not know anything about "the deal," but would look into it.  (Pls.' Ex. 58, Harrison Dep. at 217-18; Pls.' Ex. 59, Coleman Dep. at 177.)  Coleman told Harrison that ATGF's name should not be on the agreement, and Harrison agreed.  (Pls.' Ex. 59, Coleman Dep. at 177.)  This was Coleman's first conversation with Harrison on the subject of placement agreements.  (Id. at 176-77.)

In late July of 2000, Coleman once again became aware of a placement agreement referencing ATGF and representing that "funds will be kept in an escrow account by Attorney's Title Guarantee Fund, Inc."  When Coleman asked Harrison about this document, Harrison told Coleman that he was unaware of the document, and it must have been something McAllister was doing on his own.  (Pls.' Ex. 59, Coleman Dep. at 788.)  In a letter dated July 28, 2000 Coleman told Harrison:

> ATGF's name should not show up on anything but title commitments and policies. . . . .
> If you think I need to write a 'cease and desist' letter to [your staff] regarding
> the Placement Agreement and Escrow Instructions form, please let me know.  If you know of
> anyone or any entity currently operating under this Placement Agreement and Escrow
> Instructions, please inform them of the correct relationships between the parties, and that
> ATGF is not involved in any way whatsoever.

(Pls.' Ex. 69, Coleman Letter 7/28/00.)

On August 15, 2000, Coleman sent another letter to Harrison stating:

> I have recently been struggling with the issue of Placement Agreements and Escrow
> Instructions.  . . . .  It seems no one, including anyone at your office, can explain the
> details of why the transaction would be structured in such a way.  Frankly, it makes no
> sense whatsoever to hold money in a non-interest bearing account.
>        . . . .

> Please do not issue any title commitments, title insurance policies, or anything that could be construed as a binder or preliminary title report in connection with any of the escrow deals. Once again, please do whatever is necessary to keep ATGF's name completely removed from these escrow transactions in every way.  Everyone needs to understand that you, in your attorney capacity only, are going to hold these funds.  ATGF does not want any perceived liability with respect to these escrows.
>
> . . . .

(Pls.' Ex. 71, Coleman Letter 8/15/00.)[5]

In September 2000, Coleman requested an audit of Harrison's operations and solicited the help of Amy Boekhoff.  Boekhoff worked out of ATGF's office in Colorado, and had experience auditing agents in Colorado and Utah.  When Boekhoff arrived in Utah, she met with Coleman and his office employee, Cyndi Burrola.  Colman told Beokhoff  he wanted her "to look at Harrison, Robinson, [and] Millcreek."  (Pls.' Ex. 73, Boekhoff Dep. at 65.)  Coleman did not give Boekhoff any specific instructions and did not limit the scope of Boekhoff's audits.   (Id. at 155-56.)

On September 17 or 18, 2000, Boekhoff, accompanied by Burrola, went to Harrison's office.  Upon arrival, Boekhoff gave Harrison a new agency agreement which she believed had come from the Denver office.  (Id. at 70.)  She told Harrison that the agency agreement was "updated," and that ATGF needed to get the new agreement to all of the agents.  (Id.)  Boekhoff's auditing responsibilities included making sure ATGF had updated information, including a current agency agreement.  (Id. at 71.)  However, unbeknownst to Boekhoff or Harrison, the new agency agreement was different than prior agency agreements in that it sought to limit the scope of Harrison's agency exclusively to the issuance of title insurance.

---

[5]Plaintiffs assert that Coleman's August 15, 2000 letter demonstrates that he was "fully aware of the fraudulent nature of the placement agreements."  (Pls.' Opp'n to S.J. at 73.)  Although all reasonable inferences are to be drawn in favor of the non-moving party, at best, Coleman's letter and communications demonstrate his increasing suspicion regarding what Harrison represented were independent business dealings within Harrison's office.

Boekhoff then asked to see Harrison's inventory.  Boekhoff compared the inventory list provided by Harrison with an updated, computerized inventory list from Denver.  In so doing, Boekhoff observed that Harrison had a lot of jackets for which he could not account.   Boekhoff also observed that one of Harrison's closers, Dale McAllister, "was pretty sloppy," and had files that "didn't make any sense."  (Pls.' Ex. 73, Boekhoff Dep. at 78, 80, 88.)  While reviewing bank statements, Boekhoff noticed several handwritten checks.  Unlike the computerized checks, which contained file numbers, the handwritten checks did not reference file numbers.  Boekhoff also observed that the handwritten checks had "fairly common payees," one of which was McAllister.  (Id. at 88.)  After leaving Harrison's office, Boekhoff and Burrola met with Coleman.  Boekhoff reported that she was most concerned about the handwritten checks and McAllister, whose "inventory [was] totally out of control."  (Id.; Pls.' Ex. 59, Coleman Dep. at 432-33.)  Upon returning to Denver following the audits, Coleman informed Boekhoff that he was going to shift the auditing responsibility back to the Utah office and Denver's accounting office.[6]  (Pls.' Ex. 73, Boekhoff Dep. at 153.)

---

[6]  Although plaintiffs claim that Coleman "fired" Boekhoff because of the information she discovered during the audit, there is insufficient evidence in the record to support this conclusion.  Boekhoff believed that one of the purposes for her visit to Utah was to train Cyndi Burrola.  (Pls.' Ex. 73, Boekhoff Dep. at 153.)  Following the audits, Boekhoff reported that Cyndi Burrola "was very good at audits and could learn to do them."  (Pls.' Ex. 75, Condi Dep. at 152.)  Based on Boekhoff's report, Coleman appears to have made a cost-effective decision to have a local person conduct the audits rather than fly someone in from Denver.  (Id. at 153 ("He [Coleman] said he thought that [Boekhoff] was probably right, that Cindy could do it; and it could save money . . . and might be easier and more convenient for Cindy to do it.  And so he decided to give those responsibilities to Cindy.").)  This explanation for relieving Boekhoff of her Utah auditing responsibilities is further supported by the fact that later, in April of 2001, Cyndi Burrola did "follow-up" inventory for Coleman.  (Defs.' Ex. 4, Coleman Dep. at 43 (providing that Burrola returned to Robinson's office in April 2001 to follow up with the inventory).)

Following the September 2000 audit, Coleman called Harrison and said that the audit[7] had caused concern with the board. Coleman referenced, among other things, incomplete disbursement accounts and a list of checks that did not identify any file numbers. (Pls.' Ex. 58, Harrison Dep. at 242-43.) Coleman told Harrison that the board wanted an explanation for the checks as well as McAllister's unusual business practices. (Id. at 243.) By this time, Harrison was aware of numerous fraudulent transactions going on in his office and he actively sought to keep Coleman from discovering them. (Id. at 243, 246-47.)

Harrison told McAllister that he needed an explanation for the questionable checks. A few days later, McAllister provided a written explanation which Harrison knew to be false. (Pls.' Ex. 58, Harrison Dep. at 244.) Harrison asked Coleman if the explanation was "good enough," and Coleman said that, based on the audits, he continued to be concerned about McAllister's business dealings. (Id. at 250.) Harrison then asked if it would help if he fired McAllister. Coleman said it would. (Id.) Harrison fired McAllister by the end of September 2000. (Id. at 251.)

In November 2000, Coleman became aware of yet another placement agreement involving Harrison's office. On November 20, 2000, Coleman sent Harrison a letter referencing the new placement agreement and asking Harrison to "follow up" on the matter and contact him. (Pls.' Ex. 77, Coleman Letter 11/20/00.)

---

[7] Plaintiffs allege that the entire audit was a "sham" because Coleman already knew about the fraud and was, at that time, actively facilitating the ongoing fraud. (Pls' Opp'n to S.J. at 74.) In sum, plaintiffs ask this Court (and, of course, a jury) to believe that Coleman, who already knew about the fraud, actively solicited a third party to conduct an unrestricted audit, allowing her to acquire specific knowledge of the alleged fraud so that Coleman could then fire her for discovering what he already knew she would find. Plaintiffs' allegations in this regard defy logic, and the court finds there is insufficient evidence in the record to support the assertion that the audit was a sham.

Shortly thereafter, in December 2000, Coleman became aware that the door to McAllister's new office had a sign saying that he was an agent for Attorneys' Title.  Coleman called Harrison asking what involvement Harrison continued to have with McAllister, and Harrison acknowledged that they were still closing deals together.  (Pls.' Ex. 58, Harrison Dep. at 277-78.)  Coleman explained that McAllister should not have an Attorneys' Title sign on his door, and Harrison agreed.  Coleman asked Harrison if he needed to get a "cease and desist" order against McAllister.  (Id. at 278.)  Harrison called McAllister and told him that he could not have an ATGF agency sign on his door.  (Id. at 284.)[8]

Robinson's Operations

There are significantly fewer facts with regard to the time period covering the Robinson frauds.  In September of 2000, during the same time period in which Boekoff and Burrola audited Harrison's Office, Coleman also requested that they audit the office of Bryan Robinson.  (Defs.' Ex. 4, Coleman Dep. at 39-40.)  The September 2000 audit of Robinson revealed some bounced checks.  (Id. at 41.)  When Coleman asked Robinson about these checks, Robinson blamed it on his "closer" and her failure to deposit and issue checks in compliance with the timing requirements of the Good Funds Law. (Id. at 42.)

In April of 2001, Burrola returned to Robinson's office to do some follow up on his inventory.  (Id. at 43.)  Once again, Burrola noticed that Robinson had some bounced checks

---

[8]Plaintiffs allege, based on these facts, that "Coleman staged a sham firing of McAllister" and thereafter, "with Coleman's knowledge," they continued with "business as usual."  (Pls' Opp'n to S.J. at 20, 76.)  Having reviewed the citations referenced by plaintiffs in support of this allegation, the Court fails to find support for the proposition that McAllister's firing was "staged by Coleman," or that Coleman had reason to know that Harrison and McAllister were continuing to do business together until Coleman called Harrison in December 2000.  Furthermore, regardless of the actual nature of the continuing relationship between Harrison and McAllister, the relevant inquiry is to what extent Coleman, ATGF and, most importantly for the purposes of the present motion, the Florida Fund knew and/or was involved.

12

which she reported to Coleman.  Within a few days, on or about April 17, 2001, Coleman went

to Robinson's office and asked about the problem with his accounts.  (Id. at 39.)  Upon being

confronted, Robinson admitted that he had misappropriated trust funds.  (Id. at 40.)[9]

<u>                    The Florida Fund Discovers the Robinson Fraud</u>

On April 19, 2001 the Florida Fund's Claims Committee received information about a

"new defalcation in Utah."  (Pls.' Ex. 80, Claims Committee Minutes 4/19/01.)  This new

defalcation was the Robinson fraud.  Believing it would face title insurance losses resulting from

the fraud, the Florida Fund formed a team to investigate and resolve any title insurance claims.[10]

The "team" included local Utah counsel, as well as Robert Cohen, an attorney from Miami,

Florida who specializes in title insurance fraud and investigation.  (Defs.' Mem. in Supp. S.J. at

11). The Florida Fund also hired Information Data Servicing ("IDS") to assist Cohen in the

investigation.  Finally, the Florida Fund sent in-house attorney and risk manager Mary Francis

Meyers to Utah to assist ATGF in the Robinson investigation because ATGF did not have its

own staff of claims attorneys.  (Pls.' Ex. 12, Meyers Dep. at 58-59; Defs.' Mem. in Supp. S.J. at

11.)

On April 23, 2001, within four days of the Claims Committee Minutes referencing the

"new defalcation," ATGF filed an action in state court seeking an accounting and the

appointment of a receiver in the Robinson matter.  (Pls.' Ex. 78, Verified Compl. 4/23/01; Pls.'

---

[9]In January 2001, Robinson received and signed a new agency agreement.  Like the new
Harrison agency agreement, Robinson's new agreement sought to limit the scope of Robinson's
agency to the issuance of title insurance.

[10]The Florida Fund claims that ATGF retained Cohen Fox and IDS to investigate and
resolve the agent frauds.  Plaintiffs claim, however, that the Florida fund retained Cohen and
therefore Cohen's conduct should be imputed to the Florida Fund.  Whether Cohen represented
the Florida Fund or ATGF is immaterial to this motion, and the Florida Fund has assumed "for
purposes of this motion, that [Cohen] represented the Florida Fund."  (Defs.' Reply in Supp. S.J.
at 8.)

Ex. 12, Meyers Dep. at 57-58.)  ATGF agent and director David West solicited Scott Rawlings to be the receiver.

In the suit against Robinson, Coleman requested an Order appointing "a receiver knowledgeable about winding down a business," and recommended "R. Scott Rawlings who is a Utah licensed attorney in good standing who has experience acting as a court appointed representative for the purpose of winding down a business."  (Pls.' Ex. 78, Verified Compl. at 4, 5.)  In fact, Rawlings had no experience as a receiver and did not have experience winding down a business.  (Pls.' Ex. 84, Rawlings Dep. at 75-76.)  Moreover, Rawlings had a long-term, working relationship with David West, the ATGF agent and director who solicited his services.[11]

On April 23, 2001, Rawlings was appointed the receiver over Robinson's accounts and files.  In fulfilling his duties as a receiver, Rawlings relied on the Florida Fund's investigative team, and did not conduct any independent work to obtain assets and secure recovery for the fraud victims.  (Pls.' Ex. 84, Rawlings Dep. at 91-92, 131 ("It was my understanding that [ATGF] had employed specialists or experts in that area that were looking for assets, and I thought that it was within my jurisdiction to rely upon them in making such determinations or looking for assets.").)

<u>The Florida Fund Discovers the Harrison Frauds</u>

In the spring of 2001, while investigating the Robinson frauds, the Florida Fund became aware that another Utah agent was having escrow account problems. (Pls.' Ex. 12, Meyers Dep. at 167-68; Pls.' Ex. 81, Cohen Dep. at 325-26.)  Then, in early June 2001, during a status conference with the Utah Insurance Department regarding Robinson, the Department told

---

[11]Rawlings and West shared an office at all times relevant to this litigation.  (Pls.' Ex. 84, Rawlings Dep. at 50-68.)

Coleman and Cohen that it had received complaints about ATGF agent Clay Harrison. (Defs.'
Ex. 4, Coleman Dep. at 35; Defs.' Mem. in Supp. S.J. at 12.)  Following the meeting, Coleman
and Cohen went to Harrison's office and told Harrison about the Insurance Department's
concerns. (Defs.' Ex. 4, Coleman Dep. at 45-46; Pls.' Ex. 58, Harrison Dep. at 373.)  Coleman
asked specifically about McAllister's business dealings and Harrison finally admitted what he
knew about the misappropriation of funds. (Pls.' Ex. 58, Harrison Dep. at 374.)  Harrison also
admitted personal wrongdoing.  (Id. at 374-75; Defs.' Ex. 9, Cohen Dep. at 181 ("[I]f I recall,
[Harrison] pretty quickly went into a confessional where he was telling us the story that now
made the rest of the stuff make sense.  Whatever we had at the Department of Insurance didn't
exactly translate into a story, but Clay Harrison quickly got to the point.").)

The Florida Fund and ATGF immediately commenced an investigation into the Harrison
and McAllister frauds.[12]  The Florida Fund retained the same lawyers and investigators it had in
the Robinson matter with the exception of the Florida Fund's claims attorney, Mary Francis
Meyers, who did not participate in the Harrison investigation.  (Defs.' Mem. in Supp. S.J. at 12.)

_____

[12]At oral argument on the motion for partial summary judgment, plaintiffs' counsel
represented that Cohen was monitoring McAllister's bank account as early as  "the spring of
'01," and knew, therefore, that fraudulent transactions were occurring.  (Tr. of S.J. Oral
Argument at 130-31.)  This statement finds no support whatsoever in the record.  Careful review
of the relevant documents and depositions reveals that Cohen was not aware of McAllister's
bank account until early June 2001 when Cohen and Coleman, following their meeting with the
UID, confronted Harrison about the misappropriation of funds.  (See Defs.' Ex. 4, Coleman Dep.
at 33, 44-48 (providing that Coleman and Cohen met with Harrison on June 5th or 6th of 2001);
Pls.' Ex. 58, Harrison Dep. at 373 (providing that "the first week of June," following a meeting
with the UID, Coleman and Cohen came to Harrison's office to discuss "some concerns.").)
During the course of his confession to Cohen and Coleman, Harrison informed them of
McAllister's account.  (Defs.' Ex. 9, Cohen Dep. at 181, 183 (providing that when Coleman and
Cohen visited Harrison, following their meeting with the UID, Harrison said "that [McAllister]
operated like independently" and "[Harrison] mentioned they had a separate bank account.").)
Cohen stated after learning about the account, they watched fluctuations in the account balance
for approximately two weeks while working on the lawsuit and break orders.  (Id. at 185.)

On June 20, 2001, ATGF sued Harrison and McAllister.  (Pls. Ex. 60, Compl. 6/20/01.) That same day, ATGF filed a Joint Motion of Defendant Harrison and Plaintiff ATGF for Injunction, Break Order, Appointment of a Receiver and Freezing of Assets.  As with the Robinson Receivership, ATGF requested the appointment of Scott Rawlings as the receiver over Harrison's business operations.  Once again, ATGF misrepresented Rawlings' experience and failed to disclose Rawlings' extensive relationship with ATGF.

The court signed an order for Expedited Discovery and Appointment of Receiver and Filing of Liz Pendens, Freezing Assets.  The court also signed several Break Orders, authorizing entry into McAllister's premises to seize documents relating to ATGF and the fraudulent real estate transactions.  (Pls.' Ex. 101, Break Orders.)  The court appointed Rawlings as the receiver even though Rawlings was out of town at the time and had no knowledge of the Harrison action. (Pls.' Ex. 84, Rawlings Dep. at 145.**)**

### The Florida Fund's "Clean-Up" Actions

In the wake of the Harrison and Robinson frauds, the Florida Fund and ATGF took a number of actions.  As an initial matter, ATGF terminated its agency relationships with Robinson and Harrison and confiscated the agents' files.

After the title insurance losses from the Robinson and Harrison frauds had been identified, the Florida Fund entered into two transactions with ATGF designed to provide financial assistance to ATGF.  The first transaction, on August 27, 2001, was an Assignment of certain salvage assets under which the Florida Fund advanced $1.5 million in cash in exchange for an assignment of whatever assets could be salvaged and losses recouped by ATGF up to $1.5 million.  (Defs.' Ex. 1, Jones Decl. ¶ 10 & Ex. 3.)   The second transaction, on October 23, 2001,

was a Surplus Note, under which the Florida Fund loaned ATGF an additional $6 million.  These financial transactions were accounted for on the financial statements of both companies, as required by law, and were reported to the Florida and Colorado Departments of Insurance.  (Id. ¶ 10.)

As explained in greater detail above, ATGF filed lawsuits against both Robinson and Harrison in an attempt to recover its title insurance losses from the actual perpetrators of the fraud.  With court approval, Rawlings was appointed the receiver in both lawsuits. The receiver's actions, including the payment and distribution of funds from the receiverships, were approved by the courts.  (Defs.' Ex. 10, Order for Acccounting & Receiver.)  Some of the money recovered through the receiverships was transferred to the Florida Fund as partial reimbursement for the loans.  (Defs.' Ex. 12, Robinson Reconciliation; Defs.' Ex. 13, Claims/Trust Reconciliation.)

As a means of recouping some of its title insurance losses, ATGF and the Florida Fund conducted a variety of salvage operations.  The defendants formed a subsidiary, Advantage Properties, for the purpose of holding any real estate that was acquired through the salvage efforts.  The salvage operations included a variety of techniques such as simply taking assignments of properties from Robinson and McAllister and selling or collecting rents, or more complicated techniques such as purchasing a first priority position from a lender, completing a foreclosure of junior lien holders, selling the property, and using the proceeds to offset title insurance losses.  (See Defs.' Ex. 9, Cohen Dep. at 69-72.)

Some of the placement agreement and equity theft plaintiffs contacted ATGF claiming that ATGF was responsible for their losses because Robinson and Harrison were ATGF agents.  The claims were reviewed on a case by case basis.  ATGF informed some people orally that they

did not have valid title insurance claims, and ATGF sent letters to several claimants denying

such claims.

**The Instant Action**

On June 4, 2003, the plaintiffs filed the instant action alleging that by the fall of 1999[13]

ATGF, Coleman, Cohen and the Florida Fund were acting in concert with Robinson and

Harrison to accomplish the original frauds, thereafter furthered the original frauds by concealing

them, and then defrauded the victims out of recoveries from the Florida Fund and ATGF to

which they were entitled.  Plaintiffs claim that by participating in and covering up the ongoing

fraudulent activities of  Robinson and Harrison, the Florida Fund benefitted in two ways: (1) by

receiving insurance premiums on title insurance policies sold in connection with both fraudulent

and legitimate transactions; and (2) by avoiding damage to its business interests that would have

occurred if ATGF failed.  (Pls.' Opp'n to S.J. at 15, 17, 56, 186.)[14]

---

[13]Plaintiffs contend that the Florida Funds' pattern of concealment in response to agent fraud began back in 1999 when ATGF hired Cohen and IDS to investigate the Granite Title frauds.  (Pls.' Opp'n to S.J. at 55.)  The Court finds, however, that the Granite Title claims resolution was completely separate and has no relevance to the present motion.  The plaintiffs have offered no evidence of any factual or legal connection between the Granite Title fraud and the misconduct of Robinson or Harrison, and none of the plaintiffs in this case were victims of the Granite Title fraud.  The Granite Title "clean up" was in 1999 and the Robinson/Harrison investigation and response did not begin until 2001.  Simply because the defendants were involved in resolving an unrelated fraud claim involving Granite Title does not make them part of a separate agent fraud that was occurring, unknown to defendants, at the same time.

[14] In October of 1999, Kovaleski, President of the Florida Fund and Chairman of the ATGF board, sent a memorandum to the Florida Fund's executive committee explaining that in an upcoming telephone conference they would be "exploring . . . ways to minimize the impact" of agent fraud.  (Pls.' Ex. 39, Kovaleski Mem. 10/13/99.)  Plaintiffs assert that Kovaleski's memorandum demonstrates that the Florida Fund was fully aware of and facilitating the Robinson and Harrison frauds as they occurred.  (Pls.' Opp'n to S.J. at 176.)  The court disagrees. Kovaleski issued this memorandum in the wake of the Granite Title frauds and there is nothing in Kovaleski's memorandum to suggest that Kovaleski was referring to or had any knowledge of the Robinson and Harrison frauds that were occurring at that time.  After considerable additional investigation into the record by the Court, it is difficult to understand any basis in fact for plaintiffs' conclusion that the Florida Fund knew about and participated in the

Plaintiffs assert that once the frauds could no longer be concealed, in their "desperation to keep ATGF afloat and avoid liability," the Florida Fund, ATGF and Cohen formed a conspiracy to cover up the fraud through numerous criminal acts of mail and wire fraud.  Plaintiffs describe the defendants' wrongful cover-up actions as follows:  the destruction and concealment of critical documents; filing sham receivership actions; pilfering the assets of the receivership; issuing false and fraudulent denials of insurance claims; creating false agency agreements; submitting false documents to the courts; and using predatory salvage tactics.  These allegations of wrongful behavior by the Florida Fund support *all* of plaintiffs' claims against the Florida Fund, which include fraud, conversion, breach of fiduciary duty, violation of the insurance code, negligence, breach of insurance contracts, promissory estoppel, constructive trust, imputation and fraudulent concealment**,** as well as the claims based on RICO, conspiracy and alter ego.  In its present motion, the Florida Fund is seeking the dismissal of only the latter three.  The instant motion for partial summary judgment claims that the RICO, conspiracy and alter-ego claims fail as a matter of law because the Florida Fund's so called "clean up" actions were entirely separate from the underlying agent frauds.  As support for this position, defendants assert that there is insufficient evidence to support plaintiffs' contentions that the Florida Fund's officers, directors or employees had knowledge of the Robinson or Harrison frauds until after they were completed and the plaintiffs' money was gone.  (Defs.' Mem. in Supp. S.J. at 16.)  Defendants further assert that upon discovering the fraud, the clean-up actions were appropriate activities designed to identify and resolve title insurance claims in a cost-effective manner, and that, even if any of these actions were deemed to be wrongful in a way to hold the Florida Fund liable to any of the plaintiffs, there is nonetheless no support for the RICO, conspiracy and alter ego claims.  (<u>Id.</u> at

---

thefts being committed by Robinson, Harrison and McAllister.

6.)  Finally, the Florida Fund asserts that not only did it not participate in or benefit from the underlying fraud of ATGF's agents, it actually spent over $7 million in response to the frauds, making it the single largest victim of the frauds (Defs.' Reply to S.J. at 14.)

## II.  DISCUSSION

Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c); see Anderson v. Libberty Lobby, Inc., 477 U.S. 242, 250-51 (1986).  The court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Not every issue of fact or conflicting inference presents a genuine issue of material fact. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to overcome a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff."  Libberty Lobby, 477 U.S. at 252; see also Anderson v. Coors Brewing Co., 181 F.3d 1171, 1175 (10th Cir. 1999).  Finally, conclusory allegations without supporting evidence, do not raise a genuine issues of material fact, especially in light of other evidence in the record.  Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d 1164, 1178 (10th Cir. 2006); see Annett v. Univ. of Kan., 371 F.3d 1233, 1237 (10th Cir. 2004) ("Unsupported conclusory allegations . . . do not create a genuine issue of fact."); Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 530 (10th Cir. 1994) (providing that "allegations alone will not defeat summary judgment").

A.      **PLAINTIFFS' RICO CLAIMS**

The Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § § 1961-1968 (2000 ed. and Supp. III), prohibits certain conduct involving a "pattern of racketeering activity." 18 U.S.C. § 1962.[15]  One of RICO's enforcement mechanisms is a private right of action, available to "[a]ny person injured in his business or property by reason of a violation of the Act's substantive restrictions." Id. § 1964(c).[16]

The phrase "by reason of" requires that there be a causal connection or direct relationship between the plaintiffs' injury and the defendants' injurious conduct. See Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 265-66 (1992); see id. (holding that a plaintiff may sue under § 1964 (c) only if the alleged RICO violation was the proximate cause of plaintiff's injury); see also Terminate Control Corp. v. Horowitz, 28 F.3d 1335, 1345 (2ⁿᵈ Cir. 1994) (providing that the predicate acts of the alleged RICO violation must be the proximate cause of the plaintiff's injury).  "The requirement of a direct causal connection is especially warranted where the immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims. Anza v. Ideal Steel, 126 S. Ct.1991, 1998 (2006).  The proximate cause inquiry requires careful consideration of the "relation between the injury asserted and the

---

[15]The first four claims in the Second Amended Complaint are based on the Racketeer Influenced and Corrupt Organization Act, §1962 (c) & (d), and the Utah Pattern of Unlawful Activity Act (UPUAA), Utah Code Ann. § 76-10-1603(3) & (4).  The UPUAA was modeled after the federal RICO statute.  See State v. Bell, 770 P.2d 100, 101 n.1 (Utah 1988).  Because provisions of the Utah act are nearly identical to those in the federal act, federal district courts "look to the law of other states and to federal case law for guidance."  See Brickyard Homeowners' Ass'n Mgmt. Comm. v. Gibbons Realty, 668 P.2d 535, 540 (Utah 1983) (providing that "[i]dentity in language [in Utah and federal statutes] presumes identity of construction"); see also State v. Hutchings, 950 P.2d 425, 430-37 (Utah Ct. App. 1997) (adopting federal courts' interpretation of RICO as Utah law).  For the sake of simplicity, the state and federal racketeering claims are referred to as RICO claims.

[16]Plaintiffs cite 18 U.S.C. § 1964(a) and (c) as the statutory basis for RICO jurisdiction.

injurious conduct alleged."  Id.  "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to plaintiffs' injuries."  Id.

Although plaintiffs allege that the defendants knew about and facilitated the fraudulent activities of Robinson and Harrison as they were occurring, the evidence does not support such a finding or inference from a reasonable fact finder. While there is evidence that Coleman, ATGF's highest ranking officer in Utah, became increasingly aware of unusual business transactions in Harrison's office, there is no evidence that Coleman was an active participant in the underlying frauds.  Furthermore, even if Coleman knew[17] or should have known of the actual fraud, Coleman worked for ATGF, not the Florida Fund.  The Florida Fund is one step further removed, and the evidence does not support a finding that the Florida Fund was aware of the fraud as it was occurring.  Moreover, even if Coleman's alleged knowledge were somehow imputed to the Florida Fund, Coleman's initial inaction followed by his alleged actions attempting to cover up the frauds that had already occurred did not *cause* the frauds in which plaintiffs lost their money.  See, e.g., Oki Semiconductor v. Wells Fargo Bank, 298 F.3d 768, 774 (9th Cir. 2002) (declining to accept plaintiff's theory of RICO liability–that bank was liable for activities of employee and her alleged coconspirators–and stating: "[t]hat [employee] knew

---

[17]As support for their claim that Coleman had actual knowledge of and participated in the agent fraud plaintiffs rely on a hearsay statement, within an affidavit obtained on March 22, 2007, eight days before oral argument on defendant's motion for partial summary judgment.  The affidavit is from an investigator for the Utah Insurance Department, who recalls that 5 years ago, when interviewing Coleman in 2002 Coleman admitted that he was aware as early as March 2000 of criminal transactions by McAllister and Harrison.  (Pls.' Ex. 178, Lynch Aff. ¶ 5.) However, the deposition testimony of both Coleman and Harrison, combined with written correspondence, is inconsistent with this hearsay statement, and suggests only that, in the Spring of 2000, Coleman learned of an unusual investment called a "placement agreement," and then asked Harrison about the unusual transaction**.**

about the robbery or indirectly provided support for it (or theoretically that she packed sandwiches to feed the thieves) does not mean [employee's] actions directly caused the theft.").

At best, the facts suggest two separate instances of wrongdoing–the underlying agent fraud followed by an improper cover-up scheme–and plaintiffs have consistently stated that their RICO claim against the Florida Fund depends on the Florida Fund's direct participation in the underlying frauds.  Even assuming the Florida Fund's clean-up activities were unlawful, the Florida Fund cannot be liable for losses incurred in the Robinson and Harrison frauds (unlawful activity A) simply because they participated in the post-fraud cover-up (unlawful activity B). See Red Ball Interior Demolition Corp. v. Paladessa, 874 F. Supp. 576, 586-87 (S.D.N.Y. 1995). The plaintiffs in this case lost their money in the first place because they were defrauded by Robinson, Harrison, McAllister and a host of other former defendants.  Plaintiffs did not lose their money because of the clean-up actions of defendants.[18]

However, even if plaintiffs could establish that their injury was caused "by reason of" defendants' alleged improper conduct, plaintiffs are nonetheless unable to establish claims under § 1962(c) and (d).

_____

[18] The plaintiffs' claim that the Florida Fund caused their injury because it deprived them of a recovery to which they were entitled is speculative and in any event is insufficiently connected to the underlying frauds to support a RICO claim. Of the 58 fraudulent real estate transactions in this case, approximately only 10 transactions involve plaintiffs who would have been covered by title insurance.  (Tr. of S.J. Oral Argument at 14, 95 (providing that of the 94 plaintiffs, approximately "a dozen" have title insurance).)  And, whether these plaintiffs are legally entitled to be reimbursed or receive payment on these insurance claims has yet to be determined. See, e.g., Maio v. AETNA, Inc., 221 F.3d 472, 490 (3rd Cir. 2000) (finding that where "property interests" took the form of contractual rights to receive a certain level of benefits, insured parties could not establish injury to those property rights absent proof that the insurer failed to perform under the parties' contractual arrangements).  Moreover, as defendants point out, it is circular reasoning for plaintiffs to contend that the Florida Fund, through ATGF, is liable for their losses because ATGF denied liability for their losses.

1.      **RICO § 1962 (c)**

To establish a civil RICO claim under 18 U.S.C. § 1962(c) and Utah Code Ann. § 76-10-1603(2), the plaintiffs must show that the Florida Fund (1) participated in the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  BancOklahoma Mortgage Corp. v. Capital Title Co., Inc., 194 F.3d 1089, 1100 (10th Cir. 1999); Resolution Trust Corp. v. Stone, 998 F.2d 1534, 1541 (10th Cir. 1993) (citing Phelps v. Wichita Eagle-Beacon, 886 F.2d 1262, 1273 (10th Cir. 1989).

    (a)      **"Participated in the Conduct of an Enterprise"**

The Supreme Court has adopted the "operation or management" test to determine whether a defendant has "participated in the conduct" of the affairs of a RICO enterprise.  Resolution Trust, 998 F.2d at 1541 (citing Reves v. Ernst & Young, 507 U.S. 170, 183 (1993).  "For liability to be imposed under that test, the defendants must have participated in the operation or management of the RICO enterprise."  BancOklahoma, 194 F.3d at 1100.  Under this standard, RICO liability is not limited to those with primary responsibility for the enterprise's affairs, nor is it limited to those with formal positions in the enterprise, "but *some* part in directing the enterprise's affairs is required."  Reves, 507 U.S. at 179.

In BancOklahoma Mortgage Corp. v. Capital Title Co., Inc., 194 F.3d 1089, 1101 (10th Cir. 1999), the United States Court of Appeals for the Tenth Circuit applied the operation and management test to facts similar to those presently before the court.  In BancOklahoma, the plaintiffs sought to hold title companies liable under RICO for the fraudulent activities of independent mortgage companies.  Like plaintiffs in this case, the plaintiffs in BancOklahoma argued that the defendant title companies "allowed, if not actively encouraged, [the mortgage companies] to carry on with their scheme," and plaintiffs alleged via "sweeping" and

24

"conclusory" statements, that the defendants participated in the management of the RICO enterprise by engaging in numerous inappropriate activities.  Id. at 1102.  Applying the operation or management test, the Tenth Circuit determined that the title companies had done "nothing more than provide their regular services, which included closing-related services such as recording documents and issuing title commitments."  Id. at 1101.  The court rejected plaintiffs' conclusory allegations and, after careful review of the record, concluded there was no evidence suggesting the defendants directed any part of the alleged RICO enterprise.  Id.

In this case, as in BancOklahoma, plaintiffs have failed to show that the Florida Fund did anything other than provide its regular services.  There is no evidence that the Florida Fund had any role in directing the fraudulent affairs of Robinson, Harrison and McAllister.  The fraudulent schemes in this case began in approximately 1998 and continued until 2001.  There is no evidence that the Florida Fund had any knowledge of the frauds until after they had been committed, and the Florida Fund's involvement in responding to the frauds did not begin until 2001.  See Baumer v. Pachl, 8 F.3d 1341, 1344 (9th Cir. 1993) (providing that attorney's efforts "designed to forestall and coverup" his client's fraud did not satisfy the operation or management test because attorney's actions occurred five years after the scheme began and he did not play any part in directing the affairs of the enterprise).

Although the frauds in which plaintiffs lost their money may well have constituted a RICO enterprise,[19] and even assuming that the clean-up actions orchestrated by the Florida Fund

---

[19]A RICO enterprise includes any individual, partnership, corporation, association, or other legal entity, and any union or group of persons associated together for a common purpose of engaging in a course of conduct.  See U.S. v. Turkette, 452 U.S. 576, 582 (1981).  In fact, Harrison and McAllister were criminally prosecuted and convicted for felony securities fraud and racketeering violations in connection with the fraudulent activities alleged by plaintiffs.  (Second Am. Compl. at 27-28.)

constituted an enterprise, the plaintiffs have failed to demonstrate the necessary link between these two groups, and have not shown that the Florida Fund was involved in the operation or management of the enterprise that committed the frauds that resulted in plaintiffs' injuries. See Univ. of Md v. Peat, Marwick, Main & Co., 996 F.2d 1534, 1539 (3rd Cir. 1993) ("Simply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result.  There must be a nexus between the person and the conduct in the affairs of an enterprise.  The operation or management test goes to that nexus."). Because plaintiffs have failed to establish that the Florida Fund directed the activities of or participated in the alleged fraud in which plaintiffs lost their money, plaintiffs' 1962(c) claim fails on that basis.

      **(b)**      **"Pattern of Racketeering Activity"**

Plaintiffs' 1962 (c) claim also fails because there is no evidence that the Florida Fund engaged in a pattern of racketeering activity.  To prove a pattern of racketeering activity for purposes of RICO, a plaintiff must show that the defendants committed at least two predicate acts within a ten year period that are related and amount to or pose a threat of continued criminal activity.  18 U.S.C. § 1961(5).  Even assuming, for purposes of this motion, that the Florida Fund's clean-up actions were criminal predicate acts,[20] plaintiffs cannot prevail because the Florida Fund's predicate acts are neither related to the criminal acts of Robinson and Harrison, nor do they pose a threat of continued criminal activity as required by RICO.  H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989) ("To prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that

---

[20]The Florida Fund maintains that the clean-up actions were regular and lawful business practices, not crimes, and therefore cannot be criminal predicate acts under RICO.  See 18 U.S.C. § 1961(1).

they amount to or pose a threat of continued criminal activity.").

           **(i)**    **The frauds and the clean-up are not related**

     The United States Supreme Court has established that "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purpose, results, participants, victims, or methods of commission . . . ."  <u>H.J. Inc. v. Northwestern Bell Tel. Co.</u>, 492 U.S. 229, 239 (1989). Applying this test, the Court finds that the frauds in which plaintiffs lost their money and the clean-up activities of the defendants are unrelated.

     According to plaintiffs' allegations, the underlying frauds were perpetrated by certain ATGF agents, attorneys, escrow company personnel, mortgage brokers, and individual investors in order to "misappropriate money and/or property."  (Second Am. Compl. ¶ 200.)  By contrast, the clean-up actions were undertaken by the Florida Fund, Cohen, and ATGF  in order to "keep ATGF from failing to avoid the negative effect that would have on [the Florida Fund's] business in other states and to cover up [the Florida Fund's] involvement and liability under the Reinsurance Treaty."  (Pls.' Mem. In Opp. S.J. at 186.)   Moreover, as a result of the ATGF agents' fraud, Robinson, Harrison and McAllister received and then misappropriated plaintiffs' money in the combined amount of $20 million.  The Florida Fund, however, did not receive the proceeds of the agents' fraud, but rather loaned ATGF over $7 million in an attempt to clean-up the fraud.[21]

---

    [21]Plaintiffs rely on <u>United States v. Hale,</u> 1997 WL 34697 (6th Cir. Jan. 28, 1997), <u>cert. denied</u>, 522 U.S. 860 (1997), for the proposition that two separate schemes can be related in a pattern of racketeering activity.  (Pls.' Opp'n to S.J. at 187.)  However, <u>Hale</u> also states that the predicate acts comprising the two schemes must have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise [be] interrelated by distinguishing characteristics and . . . not isolated events."  <u>Id.</u> at *7.  Such is not the case here.

**(ii)      The frauds and the clean-up are not continuous**

Although the lack of relatedness alone is sufficient to disprove a pattern of racketeering activity, the second part of the "pattern" test is not satisfied either because the Florida Fund's clean-up acts do not pose any threat of continuing criminal activity.  "To establish a RICO pattern it must also be shown [in addition to relatedness] that the predicates themselves amount to, or that they otherwise constitute a threat of *continuing* racketeering activity."  H.J. Inc., 429 U.S. at 240 (emphasis in original).

Once again, even assuming the Florida Fund's clean-up acts were criminal, they do not satisfy the continuity requirement because, according to plaintiffs, they were committed in furtherance of an "immense cover-up."  (Second Am. Compl. ¶ 914.)[22]  According to plaintiffs' allegations, all of the crimes the Florida Fund is alleged to have committed are related to the cover up of the frauds, not the commission of the actual fraudulent real estate transactions.  It is well established that "attempts merely to conceal an underlying illegal predicate act are not sufficient to establish the open-ended continuity required for RICO claims."  Special Purpose Accounts Receivable Coop. Corp., 202 F. Supp. 2d 1339, 1351 (S.D. Fla. 2002) (concluding that affidavits filed in legal proceedings were "nothing more than acts of concealment" and were "not sufficient to establish the open-ended continuity required for RICO claims"); Jackson v. Bellsouth Telecomm., Inc., 181 F. Supp. 2d 1345, 1360 (S.D. Fla. 2001) (providing that agreement between former employer and attorneys, who formerly represented workers in discrimination suit, to cheat workers out of a fair settlement of their claims was not in violation of RICO since only goal for which defendants allegedly agreed was to conceal the original fraud on the workers); see Aldridge

---

[22]The Florida Fund makes the additional argument that because the clean-up actions were not criminal to begin with they cannot and do not pose a threat of continuing criminal activity under RICO.  (Defs.' Mem. in Supp. S.J. at 34.)

v. Lily-Tulip, Inc., 953 F.2d 587, 593-04 (11th Cir. 1992) (providing that acts to conceal underlying wrongdoing in a RICO suit do not carry with them a threat of future harm); see also Midwest Grinding Co., Inc. v. Spitz, 976 F.2d 1016, 1024 (7th Cir. 1992) ("A conspiracy ends when the design to commit substantive misconduct ends; it does not continue beyond that point 'merely because the conspirators take steps to bury their traces . . . after the central criminal purpose has been accomplished.'").

Because the frauds in which plaintiffs lost their money and the clean-up activities of the defendants are neither related nor continuous, they do not form a pattern of racketeering activity and plaintiffs' 1962 (c) claim fails on this basis as well.

## 2.    RICO § 1962(d)

The plaintiffs also claim that the Florida Fund violated 18 U.S.C. § 1962(d) and Utah Code Ann. § 76-10-1603(4), which make it unlawful for any person to conspire to violate 18 U.S.C. § 1962(a), (b), or (c) or Utah Code Ann. § 1603(1), (2) or (3), respectively.   To establish a RICO conspiracy liability under these provisions, plaintiffs must show the existence of an enterprise, along with the following two elements: (1) knowledge of the corrupt enterprise's activities, and (2) agreement to facilitate those activities.  See Salinas v. United States, 522 U.S. 52, 66 (1997); see also United States v. Smith, 413 F.3d 1253, 1272-73 (10th Cir.) (providing that plaintiff must show defendant "knew about and agreed to facilitate the scheme" that is part of the civil conspiracy), cert. denied, 413 F.3d 1253 (2005); see also Greyhound Fin. Corp. v. J.R. Willyard, 1989 WL 201094 (D. Utah Dec. 26, 1989) (providing plaintiff must prove "the requisite agreement to commit a statutorily defined RICO violation, this of necessity assumes defendant's knowledge of the conspiracy and intent to join or further the objectives of the conspiracy").

Plaintiffs have failed to make the showing necessary to trigger liability under the RICO

conspiracy provisions.  As explained in detail above, plaintiffs have failed to provide evidence sufficient to support a finding that the Florida Fund was aware of the Robinson and Harrison fraudulent schemes until after the frauds had been committed.  And, being unaware of the fraudulent schemes, the Florida Fund could not have agreed to facilitate the schemes in which plaintiffs lost their money.

Moreover, a conspiracy claim under RICO fails when the substantive RICO claim based on the "conducting of a RICO enterprise's affairs through a pattern of racketeering activity" is without merit.  BancOklahoma, 194 F.3d 1089, 1103 (10th Cir. 1999) ("A conspiracy claim under 18 U.S.C. § 1962(d) fails when the substantive claim based on § 1962(c) is without merit."); Edwards v. First Nat'l Bank, Bartlesville, Okla., 872 F.2d 347, 352 (10th Cir. 1989).  Because the Court has determined that plaintiffs' substantive RICO claims are without merit, the plaintiffs' conspiracy claims under 18 U.S.C. § 1962(d) and U.C.A. § 1603(4) also fail.

## B.   PLAINTIFFS' CIVIL CONSPIRACY CLAIM

Plaintiffs' civil conspiracy claim fails for substantially the same reasons as plaintiffs' RICO conspiracy claims.  A claim of civil conspiracy requires plaintiffs to prove the following five elements: "(1) a combination of two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result thereof."  Alta Indus. v. Hurst, 846 P.2d 1282, 1290 n.17 (Utah 1993) (quoting Israel Pagan Estate v. Cannon, 746 P.2d 785, 790 (Utah Ct. App. 1987).  Because the Florida Fund was unaware of the frauds until after they had been committed, it could not have had a meeting of the minds to commit the frauds.  Moreover, what the Florida Fund is alleged to have done–participate in the clean-up actions–was not the proximate cause of plaintiffs' damages. Plaintiffs' money was stolen by Robinson, Harrison and McAllister long before the Florida

Fund's clean-up actions began.  Without these essential elements, plaintiffs are unable to establish a claim for civil conspiracy.

**C.    PLAINTIFFS' ALTER EGO CLAIM**

Finally, plaintiffs claim that ATGF is the alter ego of the Florida Fund and that the corporate veil should therefore be pierced to hold the Florida Fund liable for the fraudulent acts of the rogue ATGF agents.  "The standards for the application of alter ego principals are high, and the imposition of liability notwithstanding the corporate shield is to be exercised *reluctantly* and *cautiously*."  McCulloch Gas Transmission Co. v. Kansas-Nebraska Natural Gas Co., 768 F.2d 1199, 1200 (10th Cir. 1985).  "The law permits the incorporation of businesses for the very purpose of isolating liabilities among separate entities."  Cascade Energy & Metals Corp. v. Banks, 896 F.2d 1557, 1576 (10th Cir.), cert. denied, 498 U.S. 849 (1990); see NLRB v. Greater Kansas City Roofing, 2 F.3d 1047, 1051 (10th Cir. 1993) ("The corporate structure is an artificial construct of the law, a substantial purpose of which is to create an incentive for investment by limiting exposure to personal liability.  The insulation of a stockholder from the debts and obligations of his corporation is the norm, not the exception.").  It is only in "extreme circumstances" that "the corporate form will be disregarded and the personal assets of a controlling shareholder or shareholders may be attached in order to satisfy the debts and liabilities of the corporation."  Id.

In order to pierce the corporate veil the plaintiff must satisfy a two-part test.  First, the plaintiff must show that there was such unity of interest and lack of respect given to the separate identity of the corporation by its shareholders that the personalities and assets of the corporation and the individual are indistinct.  Second, the plaintiff must show that adherence to the corporate fiction would sanction a fraud, promote injustice, or lead to an evasion of legal obligations.

NLRB, 2 F.3d at 1051; see Transamerica Cash Reserve, Inc. v. Dixie Power & Water, Inc., 789 P.2d 24, 26 (Utah 1990) (quoting Norman v. Murray First Thrift & Loan, 596 P.2d 1028, 1030 (Utah 1979)).[23]

## 1.      Separate Corporate Identities Test

The first prong of the alter ego analysis is meant to determine whether the stockholder and the corporation have maintained separate identities.  NLRB, 2 F.3d at 1052.  In the parent-subsidiary context, the central focus is "the degree of control the parent exercises over the subsidiary and the extent to which the corporate formalities of the subsidiary are observed."  Salt Lake City Corp. v. James Constructors, 761 P.2d 42, 47 (Utah Ct. App. 1988); see also NLRB, 2 F.3d at 1052 ("In determining whether the personalities and assets of the corporation and the stockholders have been blurred, the Court considers the *degree* to which corporate formalities have been maintained and the *degree* to which individual and corporate assets and affairs have been commingled.") (emphasis added).  Because virtually all corporate families involve subsidiaries controlled by the parent or majority shareholder, courts must distinguish the type of control that a parent exerts in the normal course of business from excessive control by the parent. To succeed on an alter ego theory, the plaintiff must show "such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal."  United States v. Jon-T Chemicals, Inc., 768 F.2d 686, 691 (5th Cir. 1985) (quoting W. Fletcher, Cyclopedia of the Law of Private Corporations § 43 at 204-05 (Rev. Perm. Ed. 1963)), cert. denied, 475 U.S. 1014 (1986).

---

[23]The law regarding alter ego is materially the same in Utah, Colorado and the federal courts.  Compare Prows v. State, 822 P.2d 764, 767 (Utah 1991); Micciche v. Billings, 727 P.2d 367, 372-73 (Colo. 1986); NLRB v. Greater Kansas City Roofing, 2 F.3d 1047, 1051 (10th Cir. 1993).  Accordingly, the Court need not decide the choice of law issue because the analysis and outcome would remain the same in any event.

Plaintiffs identify several factors which they believe support a finding that the Florida Fund and ATGF have failed to maintain separate identities. These factors include: (1) the Florida Fund is the majority stock holder in ATGF; (2) the Florida Fund holds a majority of seats on the ATGF board, with Kovaleski serving as the President the Florida Fund and the chairman of ATGF's board; (3) the Florida Fund and ATGF have filed consolidated income tax returns; (4) the Reinsurance Treaty permits the Florida Fund to exercise extensive control over ATGF; and (5) ATGF is grossly undercapitalized and the Florida Fund finances the operations of ATGF. (Pls.' Opp'n at 193-200.)

The factors cited by plaintiffs fail to demonstrate that ATGF is a mere instrumentality of the Florida Fund or that they lack separate corporate identities. Majority stock ownership and control of the board is not a basis for piercing the corporate veil as a matter of law. See Lowell Staats Min. Co., Inc. v. Pioneer Uravan, Inc., 878 F.2d 1259, 1263 (10th Cir. 1989) (citing cases). Courts have routinely determined that "[n]either ownership of all of the stock of a subsidiary, nor identity of officers and directors, nor both combined are sufficient to justify 'piercing the corporate veil.'" American Trading & Prod. Corp. v. Fischbach & Moore, Inc., 311 F. Supp. 412, 415 (N.D. Ill. 1970). The Supreme Court has provided, it is "entirely appropriate and expected for directors of a parent corporation to serve as directors of its subsidiary." United States v. Bestfoods, 524 U.S. 51, 69 (1998) (internal quotation and citations omitted); Seiko Epson Corp. v. Print-Rite Holdings, Ltd., 2002 WL 32513403, at *18 (D. Or. Apr. 30, 2002); see IDS Life Ins. Co. v. SunAmerica Life Ins. Co., 136 F.3d 537, 540 (7th Cir. 1998) (providing that it would be expected that shared board members would be involved in decisions affecting the subsidiary). "In fact, a complete overlap of directors and officers does not necessarily indicate improper control or undue influence." Seiko, at * 15 (citing Bestfoods, 524 U.S. at 69.)

33

Moreover, "[t]hat a stockholder should show concern about a company's affairs, ask for reports, sometimes consult with its officers, give advice, and even object to a proposed action is but the natural outcome of a relationship . . . ." <u>Lowell Staats</u>, 878 F.2d at 1264.   "Activities . . . which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures are evidence of a normal parent-subsidiary relationship and do not justify piercing the corporate veil." <u>Seiko</u>, at *14.   Under these principles, courts have recognized that it is a common business practice for a parent corporation to file consolidated tax returns with its subsidiaries, and have determined that the filing of consolidated financial reports is insufficient to impose liability under the alter ego doctrine.   See <u>Lowell Staats</u>, 878 F.2d at 1264.   Similarly, coordinated banking arrangements between parent corporations and their subsidiaries are also common and do not justify piercing the corporate veil.   See <u>Fletcher v. Atex, Inc.</u>, 68 F.3d 1451, 1459 (2nd Cir. 1995); see also <u>Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.</u>, 2003 WL 21542491, at *5 (N.D. Ill. July 3, 2003) ("It is also common practice that certain functions, such as accounting and legal services, be shared within a corporate family.   Such shared functions are insufficient to pierce the corporate veil.").

With regard to the Reinsurance Treaty, the court finds that, contrary to plaintiffs' allegations, the Reinsurance Treaty does not demonstrate a lack of separateness nor does it provide the Florida Fund with excessive control over ATGF.   The Reinsurance Treaty in question is the same treaty that was in effect between the Florida Fund and ATGF before the Florida Fund purchased an interest in ATGF in 1996.   Moreover, while the Treaty provides the Florida Fund with reasonable oversight of reinsurance-related issues, it does not allow the Florida Fund to control ATGF's day-to-day operations.

34

Finally, plaintiffs' assertion that ATGF was grossly under capitalized is unavailing.  The plaintiffs attempt to argue this factor both ways.  On one hand, plaintiffs claim the Florida Fund infused too much cash by propping up the failing business of ATGF.  (Pls.' Opp'n at 197.)  On the other hand, plaintiffs claim that the Florida Fund did not infuse enough cash, leaving ATGF insolvent.  "Capital infusions from a parent to a subsidiary are a normal, and, indeed, a necessary part of the parent-subsidiary relationship and do not in and of themselves indicate an alter ego relationship."  Seiko, at *18.  The Tenth Circuit has held that a "[shareholder] will not be exposed to liability for the obligations of [the corporation] when [the shareholder] contributes funds to [the corporation] for the purpose of assisting [the corporation] in meeting its financial obligations and not for the purpose of perpetuating a fraud."  Lowell Staats, 878 F.2d at 1263.  "In fact, [the shareholder's] infusion of capital into [the corporation] actually defeats an alter ego finding because it is proof that [the shareholder] is not siphoning assets from [the corporation] and is not improperly or unjustly trying to shield its assets by undercapitalizing its subsidiary and hiding behind the corporate veil.  Seiko, at *18.  There is nothing in the record to suggest that the Florida Fund has stripped ATGF of its assets.  Rather, the evidence shows that Florida Fund infused money into ATGF for the purpose of assisting ATGF in meeting its financial obligations. Additionally, each of the transfers of cash from the Florida Fund to ATGF were documented so as to respect the corporate differences between the two companies.  See Lowell Staats, 878 F.2d at 1263; Hill v. Dearmin, 609 P.2d 127, 128 (Colo. Ct. App. 1980).

Given these facts, the Court finds that plaintiffs have failed to establish that the Florida Fund exercised the degree of control and domination necessary to satisfy the first prong of the alter-ego test.

2.      **Inequities Test**

_____Even if the plaintiffs could establish that ATGF lacked a separate corporate identity,

plaintiffs nonetheless fail to satisfy the second prong of the alter ego test–that failure to pierce the

corporate veil would result in an injustice or inequity.  Salt Lake City Corp. v. James

Constructors, 761 P.2d 42, 47 (Utah Ct. App. 1988).  "The [alter ego] test's second prong is

addressed to the conscience of the court, and the circumstances under which it will be met will

vary with each case."  Transamerica, 789 P.2d at 26 (quoting Messick v. PHD Trucking Serv.,

Inc., 678 P.2d 791, 794 (Utah 1984)).  An element of unfairness, injustice, fraud, or other

inequitable conduct is required as a prerequisite to piercing the corporate veil.  NLRB, 2 F.3d at

1052.

> The United States Court of Appeals for the Tenth Circuit has provided:
>
> It should be emphasized that the showing of inequity necessary to satisfy the second prong
> must flow from the misuse of the corporate form. The mere fact that a corporation . . .
> breaches a contract or commits a tort does not mean that the individual shareholders
> should be personally liable.  To the contrary, the corporate form of doing business is
> typically selected precisely so that the individual shareholders will not be liable.  It is only
> when the shareholders disregard the separateness of the corporate identity *and when that
> act of disregard causes the injustice or inequity or constitutes the fraud* that the corporate
> veil may be pierced.

Id. at 1053 (citing Bangor Punta Operations, Inc. v. Bangor & A.R. Co., 417 U.S. 703, 713

(1974)); see also Transamerica Cash Reserve, Inc. v. Dixie Power & Water, Inc., 789 P.2d 24, 26

(Utah 1990) ("To find that 'observance of the corporate form would sanction a fraud and promote

injustice or an inequitable result would follow,' it must be shown that the corporation itself played

a role in the inequitable conduct at issue.") (citations omitted).

As support for their claim that failure to pierce the corporate veil would be inequitable,

plaintiffs rely, once again, on the alleged undercapitalization of ATGF.  While plaintiffs correctly

assert that "the adequacy of a corporation's capitalization looms large in a court's evaluation of

the unfairness prong," <u>James Constructors</u>, 761 P.2d at 47 n.10, as explained above, plaintiffs

have failed to show that the Florida Fund left ATGF undercapitalized.  In fact, the evidence shows

that when ATGF could not satisfy its title insurance obligations, the Florida Fund stepped in to

provide financial assistance to ATGF.  <u>See</u> <u>NLRB</u>, 2 F.3d at 1055 (providing second prong of

alter ego test was not satisfied because the record supports finding that shareholder infused the

corporation with personal assets rather than looting the corporation's assets).

      Moreover, the fact that plaintiffs may not be able to collect the full amount of their

claimed damages does not constitute the type of injustice or inequity necessary to satisfy the

second prong.  <u>Lowell Staats</u>, 878 F.2d at 1265 (providing that difficulty enforcing a judgment is

not the type of injustice that warrants piercing the corporate veil); <u>Luckett v. Bethlehem Steel</u>

<u>Corp.</u>, 618 F.2d 1373, 1379 (10th Cir. 1980) (same).  The Tenth Circuit has provided that "the

mere fact that a corporation is incapable of paying all its debts is insufficient for a finding of

injustice" because that condition "will exist in virtually all cases in which there is an attempt to

pierce the corporate veil."  <u>NLRB</u>, 2 F.3d at 1053.

      Finally, and perhaps most importantly, plaintiffs have failed to show that the injustice or

inequity they claim was caused by or stems from the alleged disregard of the separate corporate

identity.  <u>Cascade Energy & Metals Corp. v. Banks</u>, 896 F.2d 1557, 1578 (10th Cir. 1990); <u>NLRB</u>,

2 F.3d at 1052 (providing that the showing of inequity necessary to satisfy the second prong must

flow from the misuse of the corporate forms)  The plaintiffs have not shown that the Florida Fund

either became a majority shareholder of ATGF with the fraudulent intent of shielding itself from

liability or that the Florida Fund depleted the resources of ATGF in order to make it judgment

proof.  <u>See</u> <u>Seiko</u>, at *19.  Nor have plaintiffs shown that the Florida Fund "shared in the moral

culpability" for plaintiffs' fraud losses or was "an actor in the course of conduct constituting the

abuse of the corporate privilege." NLRB, 2 F.3d at 1053 (providing that the individual who is sought to be charged personally with corporate liability must have shared in the moral culpability or injustice that is found to satisfy the second prong of the test).

Based on the foregoing, the Court concludes that equity does not require it to disregard the corporate form or to find that the Florida Fund and ATGF are alter egos of one another.

### III.  CONCLUSION

For the reasons given above, the defendants' motion for partial summary judgment is granted.

IT IS SO ORDERED

DATED this 25th day of June, 2007.

_____
Dee Benson
United States District Judge

38