IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| MARK D. ALBRIGHT, et al.<br><br>Plaintiffs, | OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF CHASE HOME FINANCE'S MOTION FOR PARTIAL SUMMARY JUDGMENT |
| vs. | |
| ATTORNEYS' TITLE INSURANCE FUND, et al.<br><br>Defendants, | Case No. 2:03CV517<br>Judge Dee Benson |

This matter is before the Court on motions for summary judgment filed by the remaining parties in this action. Defendants Attorneys' Title Insurance Fund, a business trust, and Attorneys' Title Insurance Fund, Inc. (collectively "the Florida Fund") seek summary judgment on all of plaintiffs' remaining statutory, tort and contract claims. (Dkt. No. 529.) Defendants Cohen Fox P.A., Robert Cohen, and Michele Primeau (collectively "Cohen Fox" or "Cohen Fox defendants") seek summary judgment on the two tort claims that remain against them. (Dkt.

Nos. 531, 537.)  Plaintiff Chase Home Finance, LLC ("Chase") moves for partial summary

judgment on its claim against the Florida Fund for breach of contract.  (Dkt. No. 527.)  Having

considered the parties' arguments and the relevant law, the Court issues the following Opinion

and Order.


## BACKGROUND[1]

The Florida Fund is a title insurance underwriter that has been in business in Florida

since 1947.  It is a bar-related title insurance company, which means that it issues title insurance

policies through licensed attorneys who supplement their law practices with title insurance

services.  The Florida Fund is also a reinsurer for bar-related and non bar-related title insurance

companies throughout the country, including Attorneys' Title Guarantee Fund ("ATGF") in

Utah.  ATGF was established as a title insurance company in Colorado in 1960, and since that

time has expanded into Utah and Minnesota.  Like the Florida Fund, ATGF is a bar-related title

insurance company that issues title insurance policies through its lawyer agents.

In 1989, the Florida Fund entered into a reinsurance contract with ATGF.[2]  Pursuant to

_____

[1]The facts of this case have been set forth in several previous written opinions and the
Court incorporates by reference the facts set forth in these prior rulings.  See Albright v.
Attorneys' Title Ins. Fund, 504 F.Supp.2d 1187 (D. Utah 2007) (granting Florida Fund's motion
for partial summary judgment); see also February 11, 2008, Order Granting Cohen Fox
Defendants' Motion for Partial Summary Judgment; February 11, 2008, Order Denying
Plaintiffs' Motion for Rule 54(b) Certification.  Because the factual background has been
explained in detail in previous orders, the Court recounts the facts in abbreviated form.

[2]The Florida Fund and ATGF operated as independent entities until 1996 when the
Florida Fund bought stock in ATGF.  Today, the Florida Fund owns approximately 82% of
ATGF stock.  See Albright, 504 F.Supp.2d at 1192.

the Reinsurance Treaty, ATGF's primary retention was $100,000 per policy and the Florida Fund was obligated to pay all amounts above $100,000, to a maximum of $7,000,000, for each valid claim against an ATGF title insurance policy.

Between 1999 and 2001, the time period relevant to this litigation, ATGF had approximately seventy-five to ninety agents operating in Utah. Included among those agents were Clay Harrison, Dale McAllister and Bryan Robinson. Like many other ATGF agents, in addition to issuing title insurance policies, these agents also performed closing and escrow functions for real estate transactions, including purchase-sale transactions and refinancing transactions. However, unlike other ATGF agents, Robinson, Harrison and McAllister were crooks. Under the guise of legitimate transactions, they systematically and regularly stole money from unwitting victims through various fraudulent real estate schemes.[3]

The plaintiffs in this case are among a group of individuals who lost money in these fraudulent real estate transactions. Although each of the fraudulent real estate deals took a slightly different form and was perpetrated often by different individuals, the fraudulent transactions can generally be separated into two categories: (1) placement agreements, and (2) mortgage stacking and/or equity/escrow theft. The former involved phony investments and the latter involved misrepresentations about mortgage priorities.

Plaintiffs allege that the Florida Fund became aware of Robinson, Harrison and

---

[3]In 2003, Clay Harrison pleaded guilty to two second-degree felonies and two third-degree felonies involving securities fraud, misappropriation of funds from trust accounts, wrongful appropriation of funds and breach of fiduciary duty. Dale McAllister pleaded guilty to four second-degree felonies involving breach of fiduciary duty, misuse of a trust account and racketeering.

McAllister's fraudulent schemes as they were occurring, and that the Florida Fund and the law firm of Cohen Fox, acting as counsel for the Florida Fund[4], assisted and facilitated the commission of the agent frauds.  Plaintiffs further contend that once the fraud schemes could no longer be concealed, the Florida Fund and Cohen Fox then attempted to cover up the frauds through numerous criminal activities which included: destroying and concealing documents; filing sham receivership actions; pilfering the assets of the receiverships; issuing false and fraudulent denials of insurance claims; creating false agency agreements; submitting false documents to the court; and using predatory salvage tactics.  According to plaintiffs, after the original agent frauds were discovered, the defendants sought to defraud plaintiffs out of recoveries from the Florida Fund and ATGF to which they were entitled and to avoid liability for the Florida Fund and ATGF.

Originally, the plaintiffs sued 55 different defendants, including ATGF and many of the actual perpetrators of the frauds, and asserted 44 different claims.  Since the initial filing, plaintiffs have settled with, dismissed or decided not to pursue claims against all defendants except the Florida Fund and Cohen Fox.  Through various motions and stipulations, the number of claims has also been significantly reduced.

For example, on December 11, 2006, the Florida Fund filed a motion for partial summary

---

[4]The parties dispute whether Cohen Fox represented the Florida Fund or ATGF.  The Florida Fund claims that ATGF retained Cohen Fox to investigate and resolve the agent frauds. Plaintiffs claim, however, that the Florida Fund retained Cohen Fox and therefore Cohen Fox's conduct should be imputed to the Florida Fund.  For the purpose of deciding these motions, the Court will assume, in accord with plaintiffs' allegations and the prior opinions in this case, that Cohen Fox represented the Florida Fund.

judgment, seeking to eliminate plaintiffs' claims based on vicarious liability theories of RICO, conspiracy and alter-ego. On June 25, 2007, after extensive briefing and oral argument, the Court issued a Memorandum Opinion and Order granting the Florida Fund's motion, finding insufficient facts to support Plaintiffs' RICO, conspiracy and alter-ego claims. <u>Albright v. Attorney's Title Ins. Fund</u>, 504 F.Supp.2d 1187 (D. Utah 2007). In the June 25, 2007 Order, the Court found that the evidence did not support a finding or inference from a reasonable fact finder "that defendants knew about and facilitated the fraudulent activities of Robinson and Harrison as they were occurring." <u>Id.</u> at 1203-04. The Court determined that the "frauds in which plaintiffs lost their money and the clean up activities of the defendants are unrelated," and plaintiffs "have not shown that the Florida Fund was involved in the operation or management of the enterprise that committed the frauds that resulted in plaintiffs' injuries." <u>Id.</u> at 1206. The Court recognized that "[p]laintiffs' counsel have been commendably forthright in acknowledging that in order to state a RICO claim against the Florida Fund they must identify a direct link between the underlying frauds of Robinson, Harrison and McAllister and the knowing participation of the Florida Fund. This, no matter how skillfully plaintiffs' counsel tries to argue the facts, plaintiffs are unable to do." <u>Id.</u> at 1195. On February 11, 2008, the Court granted a similar motion for partial summary judgment in favor of the Cohen Fox defendants, dismissing the RICO and conspiracy claims against Cohen Fox.

As a result of various court orders and voluntary dismissals,[5] the plaintiffs' claims have

---

[5]In the Liability Analysis, plaintiffs acknowledged that their claims for fraud and aiding and abetting fraud were based on alter ego theories. Accordingly, the Court's June 25, 2007 Opinion dismissing plaintiffs' alter ego claim eliminated these claims as well. The Liability Analysis also voluntarily dismissed plaintiffs' claims for negligence/negligent supervision,

been narrowed to include only the following.  Against the Florida Fund, plaintiffs assert claims for conversion, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, fraudulent concealment, breach of contract, and violation of Utah Code Ann. § 31A-23a-407. Against the Cohen Fox defendants, plaintiffs assert causes of action based on aiding and abetting conversion and fraudulent concealment.

In the present motions for summary judgment, the Florida Fund and Cohen Fox seek dismissal of all of plaintiffs' remaining causes of action.  One plaintiff, Chase Home Finance, seeks partial summary judgment on its claim against the Florida Fund for breach of insurance contract.

## DISCUSSION

Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c); see Anderson v. Libberty Lobby, Inc., 477 U.S. 242, 250-51 (1986).  The court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Not every issue of fact or conflicting inference presents a genuine issue of material fact.

---

promissory estoppel, accounting and constructive trust, and imputation.

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to overcome a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff."  Libberty Lobby, 477 U.S. at 252; see also Anderson v. Coors Brewing Co., 181 F.3d 1171, 1175 (10th Cir. 1999).  Finally, conclusory allegations without supporting evidence, do not raise a genuine issues of material fact, especially in light of other evidence in the record.  Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d 1164, 1178 (10th Cir. 2006); see Annett v. Univ. of Kan., 371 F.3d 1233, 1237 (10th Cir. 2004) ("Unsupported conclusory allegations . . . do not create a genuine issue of fact."); Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 530 (10th Cir. 1994) (providing that "allegations alone will not defeat summary judgment").

I.      **Plaintiffs' Tort Claims Against the Florida Fund**

The Florida Fund seeks summary judgment on the four tort claims that remain against it. These include claims for conversion, breach of fiduciary duty, aiding and abetting breach of fiduciary duty and fraudulent concealment.  The Florida Fund asserts that each of these tort claims must fail as a matter of law because plaintiffs do not have sufficient facts to establish the necessary element of causation.

The Florida Fund relies on this Court's June 25, 2007 Memorandum Opinion and Order in which the Court found that "what the Florida Fund is alleged to have done–participate in the clean up actions–was not the proximate cause of plaintiffs' damages.  Plaintiffs' money was stolen by Robinson, Harrison and McAllister long before the Florida Fund's clean-up actions

7

began." <u>Albright</u>, 504 F.Supp.2d at 1208.  According to the Florida Fund, the lack of any causal connection between the frauds in which the plaintiffs lost their money and the clean up actions attributed to the Florida Fund was precisely the analysis the Court undertook in granting summary judgment with respect to plaintiffs' racketeering and conspiracy claims.  Therefore, the Florida Fund maintains, the Court's analysis of proximate cause in the context of the RICO claims translates directly to the remaining tort claims where the proximate cause analysis is legally identical.  (Defs.' Mem. in Supp. at 10.)

Plaintiffs respond that the Florida Fund is liable for the tortious actions of Robinson, Harrison and McAllister based on agency principles, and that the Florida Fund "proximately caused plaintiffs' losses by failing in its legal duty to warn plaintiffs about its agents' schemes." (Pls.' Mem. in Opp'n at 7.)  More specifically, plaintiffs assert that ATGF and its agents Robinson, Harrison and McAllister were also agents of the Florida Fund and therefore the agents' knowledge and intent were imputed to the Florida Fund, triggering a duty in the Florida Fund to disclose such knowledge in the plaintiff transactions in which the Florida Fund was involved (i.e., the real estate transactions that closed with Harrison's or Robinson's agencies that involved title insurance between $100,000 and $7,000,000 in coverage).  (Pls.' Mem. in Opp'n at ix.)

To establish an agency relationship "a person must be authorized by another to act on his behalf and subject to his control."  <u>Gildea v. Guardian Title Co.</u>, 970 P.2d 1265, 1269 (Utah 1998) (quoting Restatement (Second) of Agency § 1 (1958)).  "Whether an agency relationship exists depends upon all the facts and circumstances of the case."  <u>Id.</u> (citing <u>Vina v. Jefferson</u>

Ins. Co., 761 P.2d 581, 585 (Utah Ct. App. 1988)).  Although the question of whether an agency

relationship exists is typically one of fact, "where the evidence as to the agent's authority is

undisputed, or different reasonable logical inferences may not be drawn therefrom, this question

is one of law."  3 Am Jur.2d Agency § 373, at 891-92 (2000).

 Under Utah law, in order for plaintiffs to show that Robinson, Harrison and McAllister

were the Florida Fund's agents, plaintiffs must establish the following:  (1) [The Florida Fund]

manifested that [Harrison and McAllister] could act for [it], (2) [Harrison and McAllister]

accepted the proposed undertaking, and (3) both [the Florida Fund] and [Harrison and

McAllister] understood that [the Florida Fund] was to be in charge of the undertaking.  Wardley

Corp. v. Welsh, 962 P.2d 86, 89 (Utah Ct. App. 1998) (citing Restatement (Second) of Agency §

1(1) (1958)); Mecham v. Consolidated Oil & Transp. Inc., 53 P.3d 479, 483 (Utah Ct. App.

2002) (applying same three criteria and finding no agency relationship).  In applying these

criteria, Utah courts have remarked: "'[A]n agency is created and authority is actually conferred

very much as a contract is made': a meeting of the minds must exist between the parties."

Wardley, 962 P.2d at 89 (quoting 3 Am. Jur. 2d Agency §  17 (1986)).  To meet this burden,

plaintiffs rely almost exclusively on the Reinsurance Treaty.  Plaintiffs claim that  "ATGF and

its agents were authorized to act on [the Florida Fund's] behalf pursuant to the Reinsurance

Treaty" and "the Reinsurance Treaty vests [the Florida Fund] with the right to control ATGF and

its agents."  (Pls.' Mem. in Opp'n at 2, 4.)

 More specifically, with regard to the first criteria–whether the Florida Fund "manifested

that the ATGF agents could act for it"–plaintiffs assert that because the Reinsurance Treaty

"automatically" required the Florida Fund to provide coverage directly to those who paid a premium to an ATGF agent for title insurance between $100,000 and $7,000,000, the Reinsurance Treaty effectively authorized ATGF and its agents to act on its behalf.  In other words, Plaintiffs contend that Robinson, Harrison and McAllister acted with authority of the Florida Fund when issuing ATGF title insurance policies because, once the policies were issued, they were automatically reinsured by the Florida Fund.  Plaintiffs' argument implies that, because the Florida Fund was obligated under the Reinsurance Treaty to reinsure certain ATGF policies, when Robinson, Harrison and McAllister were issuing ATGF policies they were simultaneously acting on behalf of the Florida Fund issuing Florida Fund reinsurance policies.

However, the fact that Robinson, Harrison and McAllister may have issued policies underwritten by ATGF does not mean they simultaneously *issued* Florida Fund reinsurance policies.  As a matter of law, "the reinsurance contract is not tied to the contract between the insurer and its insured; it is a completely separate transaction."  Wilcox v. Anchor Wate Co., 164 P.3d 353, 358 (Utah 2007).  As the Florida Fund points out, there is no contract between the reinsurer and the insured, and no buyer or lender in any real estate transaction receives a reinsurance policy in the way he or she receives a title insurance policy.  Rather, the insured has a contract with the underwriter, and the underwriter can, in turn, enter into a separate contract for reinsurance, as ATGF did with the Florida Fund.  (Defs.' Reply in Supp. at 7.)  The reinsurance arises simply by virtue of the issuance of the underlying title insurance policy, and the insured does not have the option to either accept or buy reinsurance or not.  Accordingly, the only insurance product Robinson, Harrison and McAllister were issuing were ATGF title policies.  In

sum, there is nothing in the Reinsurance Treaty to suggest that Robinson, Harrison and McAllister, or any other ATGF agent, was authorized to act on behalf of the Florida Fund "issuing reinsurance," and there is nothing to suggest that the fraudulent real estate transactions would have been any different had the Florida Fund not been a reinsurer.

Aside from the simple fact that the Florida Fund was "automatically" bound to provide coverage directly to individuals purchasing title insurance between $100,000 and $7,000,000, plaintiffs have provided no evidence to suggest that Robinson, McAllister and Harrison were authorized by the Florida Fund to represent or in fact represented the Florida Fund. Wardley Corp. v. Welsh, 962 P.2d 86, 89 (Utah Ct. App. 1998) ("An agency relationship can arise only at the will and by the act of the principal."). The Court finds it significant that Robinson, Harrison and McAllister did not hold themselves out as agents of the Florida Fund and the Florida Fund's name did not appear on any title insurance document, letterhead, business cards, or any other real estate document related to any of the underlying transactions. By way of contrast, when plaintiffs were arguing that Robinson, Harrison and McAllister were agents of ATGF, it was precisely this type of evidence that plaintiffs produced as a basis for their claim of agency. As the Florida Fund points out, when plaintiffs were asserting that Harrison and McAllister were acting as agents of ATGF, plaintiffs relied on the fact that Harrison signed an agency agreement with ATGF, held himself out with cards and on letterhead as an "ATGF agent," and ATGF filed formal notices of appointment for both Harrison and McAllister with the Utah State Department of Insurance. See Complaint ¶¶ 187-223, 232, 358, 545, 672. "The very facts that the plaintiffs tout as establishing the agency relationship between ATGF and Harrison and McAllister are all

absent in the relationship between the Florida Fund and Harrison and McAllister." (Defs.' Reply at 13 n.8.)

With regard to the element of control, plaintiffs generally assert that "the Reinsurance Treaty vests [the Florida Fund] with the right to control ATGF and its agents." (Pls.' Mem. in Supp. at 4.)  In support of this argument, plaintiffs claim that "agreements like the Reinsurance Treaty have been held to effectuate an agency relationship between reinsurers and the reinsureds." (Pls.' Mem. in Opp'n at 4 (citing <u>Compagnie de Reassurance d'Ile de France v. New England Reinsurance Corp.</u>, 944 F.Supp. 986, 996 (D.Mass. 1996)).)  However, aside from these generalized statements, plaintiffs have failed to identify a single provision in the Reinsurance Treaty in support of this claim, and plaintiffs have failed to show how the Reinsurance Treaty at issue in this case gave the Florida Fund the right to control Robinson, Harrison and McAllister.

Instead, plaintiffs claim that in addition to the Reinsurance Treaty, "[the Florida Fund's] controlling ownership and interest and domination of ATGF" also gives rise "to the [the Florida Fund's] right to control ATGF and ATGF's agents." (Pls.' Mem. in Opp'n at 4.)  To support this argument, plaintiffs rely on the following evidence:  (1) the Florida Fund had a majority ownership of ATGF; (2) the Florida Fund had the majority of seats on the ATGF's board of directors; (3) the Florida Fund entered into the Reinsurance Treaty with ATGF; and (4) the Florida Fund loaned ATGF money to help ATGF cover its title insurance losses.  (Pls.' Mem in Opp'n at x-xviii.)

Plaintiffs' argument in this regard is reminiscent of if not identical to plaintiffs' alter-ego

claim which this Court rejected in the June 25, 2007 Order.  After a thorough review of the same evidence now offered for plaintiffs' agency theory, this Court found that majority ownership and seats on a subsidiary's board of directors are "routine" and "entirely appropriate and expected" in a parent subsidiary relationship.  See Albright, 504 F.Supp.2d at 1210.  With regard to the Reinsurance Treaty, this Court determined that it did not provide the Florida Fund with excessive control over ATGF nor did it demonstrate a lack of separateness.  Id.  Finally, with respect to the loans, the Court found that they were made for the "purpose of assisting ATGF in meeting its financial obligations" and they "were documented so as to respect the corporate differences between the two companies."  Id. at 1211.

In light of recognizing that standard for finding an alter-ego relationship is separate and distinct from finding an agency relationship, and also acknowledging, as plaintiffs assert, that "agency control may be easier to establish when a parent-subsidiary relationship is involved," (Pls.' Mem. in Opp'n at 4 (citing Bearly v. Norton-Simon, Inc., 479 F.Supp. 812, 815 (W.D. Pa. 1979)), the Court nonetheless finds that the facts alleged by plaintiffs fail to demonstrate the level of control necessary to create an issue of fact as to whether Robinson, Harrison and McAllister were agents of the Florida Fund.

In light of the foregoing, the Court finds there are insufficient facts to support a finding that ATGF agents Robinson, Harrison and McAllister were authorized by the Florida Fund to act on its behalf and subject to its control.  See Gildea v. Guardian Title Co., 970 P.2d 1265, 1269 (1998) (quoting Restatement (Second) of Agency § 1 (1958)).  Having concluded there are insufficient facts to support plaintiffs' agency theory, the Court finds there is no basis for

plaintiffs' tort claims against the Florida Fund.[6]

## II.   __Plaintiffs' Contract Claims Against the Florida Fund__

Next, the Florida Fund moves for summary judgment on all of plaintiffs' claims for breach of contract.  None of the plaintiffs in this case assert that they have an insurance contract directly with the Florida Fund.  Rather, plaintiffs' breach of contract claims against the Florida Fund are based on the Reinsurance Treaty between the Florida Fund and ATGF which provides that the Florida Fund may be directly liable to insureds who have a valid title insurance contract with ATGF for coverage between $100,000 and $7,000,000.  (Defs.' Ex. M, Reinsurance Treaty §§ 2.1, 2.9.)  One plaintiff, Chase Home Finance, has filed a cross-motion for summary judgment on its breach of insurance contract claim against the Florida Fund.  (Dkt. No. 527.)

---

[6]At oral argument on the summary judgment motions the Court inquired of plaintiffs' counsel if all of the tort claims were based on an agency relationship.  (Tr. of 4/30/08 at 59-60.) Plaintiffs' counsel responded "yes" and explained, "I would say if you wouldn't find a [Florida Fund/Harrison] agency that we would have a hard time proving causation . . . I agree with that assessment."  (Id.)  However, after further inquiry from the Court, plaintiffs' counsel reconsidered and said, "well, I guess the conversion claim wouldn't [depend on an agency theory and] . . . the breach of fiduciary duty wouldn't either."  (Id. at 61.)

Having carefully scrutinized the memoranda and supporting documents, the Court finds that other than a vague sentence in the briefing, plaintiffs' "direct theories" were not clearly spelled out.  It is fair to say that the Florida Fund was not on notice of any direct tort claim, (Defs.' Mem. in Supp. at 9 ("Plaintiffs never have alleged that they lost their money because of something the Florida Fund did during the clean-up phase in which it allegedly participated.")), and the subject was only raised by the Court.

Moreover, as reflected in the Court's June 25, 2007 Order, there is no evidence suggesting any involvement by the Florida Fund in the underlying ATGF agent frauds in which plaintiffs lost their money.  See Albright, 505 F.Supp.2d at 1203-04.  Similarly, there is insufficient evidence to support finding that any of the money recovered in the Robinson or Harrison receiverships was misappropriated by the Florida Fund or Cohen Fox directly to the further disadvantage of plaintiffs.

Of the numerous plaintiffs in this case, only four are asserting breach of contract claims against the Florida Fund.  These plaintiffs include: Constance Gleave, Ann Startup, Kaye Horrocks and Chase Home Finance.  None of these plaintiffs has come forward with a complete and binding title insurance commitment or policy from ATGF.  In fact, plaintiffs readily admit that "no policy was issued" for Gleave, Horrocks and Startup, (Pls.' Mem. in Opp'n at 16), and Chase has provided only an incomplete title commitment and policy.  Nonetheless, plaintiffs Gleave, Horrocks and Startup assert that the evidence of record creates at least an issue of fact as to whether they had "oral insurance contracts or contracts to procure insurance" with ATGF.  Plaintiff Chase Home Finance asserts that, not only is there an issue of fact, but based on the evidence it has provided, this Court can affirmatively conclude as a matter of law that Chase had a valid and binding insurance contract with ATGF.  (Dkt. No. 527, Chase Mem. in Supp. at 5.)

The Florida Fund maintains, however, that all of plaintiffs' contract claims fail as a matter of law because: (1) none of the plaintiffs has a valid insurance contract with ATGF, and (2) even if any or all of the plaintiffs had a valid insurance contract with ATGF, the Reinsurance Treaty specifically excludes coverage for losses resulting from agent fraud.  (Defs.' Mem. In Supp. at 14.)

## A.    Plaintiffs' Insurance Contracts with ATGF

A prerequisite to the Florida Fund's liability under the Reinsurance Treaty is the existence of a valid title insurance policy between ATGF and the insured for coverage in an amount between $100,000 and $7,000,000.  Although none of the plaintiffs have come forward with complete and binding written policies, they assert that their contract claims are still valid

because a reasonable jury could conclude that plaintiffs "entered into oral insurance contracts or contracts to procure insurance."  (Pls.' Mem. in Opp'n at 16.)

Although plaintiffs are correct in their assertion that all of the terms of an insurance contract need not be contained in a writing, (Pls.' Mem. in Opp'n at 11 (citing Arko v. Farmers Ins. Exch., 516 P.2d 1395, 1397 (Utah 1973)), they must nonetheless come forward with evidence to establish the essential elements of a contract with ATGF, whether written or oral. Under Utah law, an insurance contract requires that "the parties arrive at an agreement as to all of the elements which are essential to an insurance contract, including the subject matter to be covered, the risk insured against, the amount of the indemnity, the duration of the coverage and the premium."  Harris v. Albrecht, 86 P.3d 728, 731 (Utah 2004).

Applying these principles to the facts of this case, the Court concludes that each of the four plaintiffs has failed to provide information sufficient to satisfy the essential elements of an insurance contract as set forth in Harris.  For example, while there is some evidence suggesting payment of insurance premiums, (Pls.' Ex. 297 (Gleave Docs.), 312 (Horrocks Docs.), and 321 (Startup Docs.)), the payment of premiums, standing alone, is not sufficient to establish a binding insurance contract under Utah law.  Similarly, although Chase has provided a written commitment and policy, both are incomplete and fail to provide proof of the essential elements of an insurance contract.  In addition, two Utah courts have held that the incomplete title commitments of similarly situated victims of ATGF agent fraud were insufficient as a matter of law. (Defs.' Mem. in Supp. Exhs. P & Q,  Millenia Investment Corp. v. Attorneys Title Guarantee Fund, Case No. 000902574, Third Judicial District Court, State of Utah; Novastar

16

<u>Mortgage Inc. v. Attorneys Title Guarantee Fund</u>, Case No. 020902195, Third Judicial District

Court, State of Utah.)  Because plaintiffs are unable to show the existence of a primary insurance

contract with ATGF, plaintiffs' breach of contract claims against the Florida Fund fail as a

matter of law.

      **B.**      **The Scope of the Reinsurance Treaty**

      Furthermore, even if one or more of the plaintiffs could establish a primary insurance

contract with ATGF, their contract claims against the Florida Fund would fail because the Court

finds that the express terms of the Reinsurance Treaty exclude reinsurance liability for losses that

are caused by ATGF agent fraud.

      Section 2.9 of the Reinsurance Treaty allows an ATGF insured, under certain

circumstances, to enforce the Reinsurance Treaty directly against the Florida Fund only "to the

extent of [the Florida Fund's] liability to [ATGF]" under the Reinsurance Treaty.  Section 2.9

provides:

> In addition to its liability to [ATGF] on any Policy reinsured hereunder, provided an
> insured shall give [the Florida Fund] notice of a claim under a Policy subject to this
> Agreement within a reasonable time after notice of the claim is given to or received by
> [ATGF] and the insured is pursuing its remedies under such Policy against ATGF, then in
> the event that under the terms of the Policy the insured has sustained a loss or losses,
> which, in the aggregate, exceed [ATGF's] primary loss risk, the liability of [the Florida
> Fund] under this Agreement shall be extended to and in favor of such insured.
> Thereafter, ***if the insured requests payment of [the Florida Fund's] liability under this
> Agreement directly to the insured, this Agreement may be enforced by the insured
> directly against [the Florida Fund] to the extent of [the Florida Fund's] liability to
> [ATGF] hereunder, without diminution, defense, set off or counter claim which [the
> Florida Fund] may have against [ATGF.]***

(Defs.' Ex. M, Reinsurance Treaty § 2.9.)

      Thereafter, in section 3.2, the Reinsurance Treaty explicitly provides that the "extent of

the Florida Fund's liability to ATGF" does not extend to losses which are caused by the fraud of

ATGF agents.  Specifically, section 3.2 provides: "[a]s between [the Florida Fund] and [ATGF],

[the Florida Fund] shall not be liable for any loss caused by, or resulting from, any fraudulent or

dishonest act or acts committed by any employees or agents of [ATGF] . . . ."  (Defs.' Ex. M,

Reinsurance Treaty.)  There is no dispute that plaintiffs' losses in this case arise from ATGF

agent fraud.  Therefore, because losses due to agent fraud are excluded from coverage under the

Reinsurance Treaty, and because the Florida Fund can be liable to ATGF insureds only to the

extent of its liability to ATGF, the Florida Fund is not liable to ATGF or plaintiffs as a matter of

law.

        Relying on the identical provisions in the Reinsurance Treaty, plaintiffs argue that even

though the Florida Fund cannot be liable to *ATGF* for losses caused by agent fraud, the Florida

Fund can be directly liable to *ATGF insureds* for losses caused by agent fraud.  (Pls.' Mem. in

Opp'n at 17-18.)  In making this argument, plaintiffs focus on the phrase "without diminution,

defense, set off or counterclaim which Florida may have against ATGF" found in section 2.9.

Notwithstanding the immediately preceding phrase–"This agreement may be enforced directly

against Florida to the extent of Florida's liability to ATGF"–plaintiffs assert that the "without

diminution" phrase means that the Florida Fund's liability to insureds is not limited to the

Florida Fund's liability to ATGF.  (Pls.' Mem. in Opp'n at 18 ("[The Florida Fund's] directly

liability to insureds is unaffected by any "diminution, defense, set off, or counterclaim" that [the

Florida Fund] could assert on the basis of fraud by ATGF agents.  Instead, any such diminution,

defense set off or counterclaim is a matter solely between [the Florida Fund] and [ATGF].").)

Plaintiffs' interpretation of the Reinsurance Treaty would require this Court to construe section 2.9 so that the "without diminution, defense, set off or counter claim" phrase would contradict and render meaningless the preceding phrase, "to the extent of Florida's liability" to ATGF.  Such an interpretation would violate the fundamental law of contract interpretation that requires courts to construe provisions of a contract in harmony with one another.  See Plateau Mining Co. v. Utah, 802 P.2d 720, 725 (Utah 1990) ("[E]ach contract provision is to be considered in relation to all of the others, with a view toward giving effect to all and ignoring none."); Wagner v. Clifton, 62 P.3d 440, 443 (Utah 2002) (the court must "attempt to harmonize all of the contract provisions and all of its terms when determining whether the plain language of the contract is ambiguous").[7]

Applying established rules of contract interpretation, the Court's interpretation of section 2.9 of the Reinsurance Treaty gives effect to all of the contract's provisions.  Accordingly, the Court finds that the phrase "to the extent of Florida's liability" means that the Florida Fund is not liable to ATGF's insureds to any greater extent than it is liable to ATGF, which does not include losses due to agent fraud.  And, the phrase "without diminution, defense, set off or counter claim" does not change the conditions under which the Florida Fund is liable, it simply refers to contractual or other defenses the Florida Fund might have against ATGF.  In other words, the "without diminution" clause means that if the Florida Fund has a claim or a defense against ATGF, unrelated to the scope of coverage of the reinsurance treaty, then that claim or defense

---

[7]Additionally, as the Florida Fund points out, "[p]laintiffs' interpretation of section 2.9 of the Reinsurance Treaty is implausible because it suggests that the Florida Fund knowingly undertook greater duties to third parties than it took to the other contracting party, ATGF." (Defs.' Reply at 18.)

cannot be asserted against the insured.

### III.    <u>Plaintiffs' Section 31A-23a-407 Claims Against the Florida Fund</u>

Finally, the Florida Fund seeks summary judgment on plaintiffs' claims under Utah Code

Ann. § 31A-23a-407 which provides:

> Any title company, represented by one or more title insurance producers, is directly and primarily liable to others dealing with the title insurance producers for the receipt and disbursement of funds deposited in escrows with the title insurance producers in all those transactions where a commitment or binder for or policy or contract of title insurance of that title insurance company has been ordered, or a preliminary report of the title insurance company has been issued or distributed.  This liability does not modify, mitigate, impair, or affect the contractual obligations between the title insurance producers and the title insurance company.

Utah Code Ann. § 31A-23a-407 (2005).

Plaintiffs claim a reasonable jury could find that, because the Florida Fund's liability was

"automatic and obligatory" once ATGF agents produced insurance between $100,000 and

$7,000,000, Robinson, Harrison and McAllister were "title insurance producers" who

"represented" the Florida Fund in issuing such policies.[8]   (Pls.' Mem. in Opp'n at 20.)  Plaintiffs

further assert that "a title reinsurer is a title insurer" and "nothing in the plain language of [§

407] suggests that a title company that is a title reinsurer should be exempt from the statute."

(<u>Id.</u> at 19, 20.)

Having carefully reviewed section 31A-23a-407, the Court finds it does not apply to the

Florida Fund.  First, nothing in section 407 says it applies to reinsurers.  In drafting Title 31A,

---

[8]There are 28 plaintiffs asserting claims under Utah Code Ann. § 31A-23a-407.  (Pls.' Mem. in Opp'n at 24-25.)

the Insurance Code, the legislature specifically distinguished title insurers from reinsurers.

Section 31A-23a-103, which sets forth the "scope and applicability" of the Insurance Code states

plainly: "(3) [e]xcept as otherwise expressly provided, this title does not apply to: ... (g)

reinsurance." § 31A-1-103(3)(g).  Although reinsurance is repeatedly referred to in Title 31A,

the statute at issue in this case, section 31A-23a-407, does not expressly provide that it applies to

reinsurers.  By comparison, when the legislature intended for parts of Title 31A to apply to

reinsurers it said so.  See, e.g., Utah Code Ann. § 31A-20-107 (entitled "Reinsurance" and

expressly applying to reinsurers); Id. § 31A-5-102 (containing the following express inclusion of

reinsurance: "[t]his chapter applies to corporations doing a reinsurance business, whether or not

they do other insurance business").  Based on these provisions, the Court finds that if the

legislature had intended reinsurers like the Florida Fund to be strictly liable under section 407, in

addition to title companies, it would have said so.

Moreover, by its terms, section 407 applies to "title insurers" and "title compan[ies]" that

are represented by "title insurance producers" who receive and disburse funds in escrow.  Id. §

407.  As a reinsurer, the Florida Fund did not have agents because it does not issue "reinsurance

policies" to insureds.  For this reason, no Florida Fund representative closed any transaction or

received or dispursed any funds in escrow.  Although Robinson, Harrison and McAllister may

have been title insurance producers for ATGF, this Court has already concluded that these ATGF

agents did not represent the Florida Fund.

Moreover, even if section 407 somehow applied to reinsurers in general, it would not

apply to the Florida Fund in this case.  A "title company" is liable under this statute only "where

a commitment or binder for or policy or contract of title insurance *of that title insurance company* has been ordered, or a preliminary report *of the title insurance company* has been issued or disbursed." Id. § 31A-23-407 (emphasis added.) In this case, if any commitment, policy or preliminary title report was issued or ordered, it was done by or for ATGF. There is no evidence or even an allegation that the Florida Fund issued any reinsurance commitment, policy or title report in any of the plaintiffs' transactions.

For these reasons, as well as the additional reasons stated in the Florida Fund's Memorandum in Support of Summary Judgment, (Defs.' Mem. in Supp. at 21-24), the Court concludes that plaintiffs' claims under Utah Code Ann. § 31A-23-407 fail as a matter of law.


**IV.    Plaintiffs' Tort Claims Against Cohen Fox**

Finally, the Cohen Fox defendants have moved for summary judgment on plaintiffs' remaining tort claims against them for conversion and fraudulent concealment. (Dkt. Nos. 531 and 537.)

**A.    Conversion**

In the Second Amended Complaint, plaintiffs set forth a cause of action based on conversion "as against all defendants" generally. Plaintiffs allege that the defendants as a group "took the Plaintiffs' property and/or escrowed funds and converted them to their own personal use without the Plaintiffs' knowledge or consent and contrary to the various agreements with Plaintiffs." (Second Am. Compl. at 237, ¶¶ 1078-1081.)

Conversion is an act of willful interference with chattel done without lawful justification

22

by which the rightful owner of the property is deprived of its use and possession.  Phillips v.

Utah State Credit Union, 811 P.2d 174, 179 (Utah 1991).  For purposes of a conversion claim,

"chattel" generally includes only goods and personal property and does not include real property.

18 Am. Jur. 2d Conversion § 15 (2004).  Similarly, money can be the subject of conversion only

if the claim is made against the person who has taken the money as his own.  Jones v. Salt Lake

City Corp., 78 P.3d 988 (Utah Ct. App. 2003).

Given these legal principles, it is readily apparent that the conversion claim set forth in

the Second Amended Complaint cannot stand against the Cohen Fox defendants.  As indicated

above, real property cannot the subject of a claim of conversion, and plaintiffs have failed to set

forth any facts to show that chattel or money was taken from a plaintiff and converted to the

personal use of Cohen Fox.  Absent a showing of conversion of chattel and/or money to the

Cohen Fox defendants personally, plaintiffs claim fails as a matter of law.

Apparently recognizing that the conversion claim as alleged in the Second Amended

Complaint cannot stand against Cohen Fox, plaintiffs respond to Cohen Fox's summary

judgment motion with the assertion that "Cohen had full knowledge of the Harrison and

McAllister schemes [and] *he aided and abetted their conversion* of funds from Plaintiffs."  (Pls.'

Mem. in Resp. at 24 (emphasis added).)

Although Utah courts appear to recognize aiding and abetting liability for intentional

torts in general, Russell/Packard Development Inc. v. Carson, 78 P.3d 616 (Utah Ct. App. 2003),

plaintiffs readily acknowledge that Utah courts have not specifically recognized a cause of action

for aiding and abetting conversion.  (Pls.' Mem. in Resp. at 24.)  But perhaps more importantly,

this Court has already determined that Cohen Fox did not have specific knowledge of Harrison and McAllister's fraudulent real estate transactions until after they occurred, and therefore Cohen Fox did not adopt, join or conspire in the fraud schemes in which plaintiffs lost their money.  Accordingly, any claim against the Cohen Fox defendants for aiding and abetting conversion would likewise fail.

**B.      Fraudulent Concealment**

Plaintiffs' fraudulent concealment claim appears to be two-fold.  First, plaintiffs assert that Cohen Fox fraudulently concealed information during the course of the underlying agent fraud.  In this regard, plaintiffs claim that Cohen Fox had detailed knowledge of Robinson, Harrison and McAllister's fraudulent schemes, but failed to disclose the fraud to the authorities or to plaintiffs who were then being defrauded by the agents.  (Pls.' Mem. in Resp. at 20.) Second, Plaintiffs claim that Cohen Fox also fraudulently concealed material information relating to the Harrison and Robinson receiverships.  More specifically, plaintiffs allege that Cohen Fox concealed the receiver's lack of experience, his close ties with ATGF, and "the fact that he was doing very little as the receiver" while Cohen effectively performed the receivership functions.  (Id. at 21.)

Cohen Fox maintains that under either of plaintiffs' theories, their fraudulent concealment claim fails as a matter of law because, among other things, plaintiffs have not alleged, nor can they establish, the necessary legal duty between Cohen Fox and any of the plaintiffs.  (Cohen Fox Mem. in Supp. at 6.)

Under Utah law, in order to establish fraudulent concealment, a plaintiff must prove "(1)

the nondisclosed information is material, (2) the nondisclosed information is known to the party failing to disclose, and (3) there is a legal duty to communicate."  Smith v. Frandsen, 94 P.3d 919, 923 (Utah 2004) (quoting Hermansen v. Tasulis, 48 P.3d 235 (Utah 2002)).  The Utah Supreme Court has stated that "[t]hese elements are presented in inverse order of importance," and the analysis should begin "with an inquiry into the existence and scope of the duty owed the plaintiff by the defendant."  Yazd v. Woodside Homes Corp., 143 P.2d 283, 286 (Utah 2006).  "The determination of whether a legal duty exists falls to the court.  It is a purely legal question, and since in the absence of a duty a plaintiff will not be entitled to a remedy, it is the first question to be answered."  Id.

Applying these principles, the Court finds that plaintiffs' fraudulent concealment claim fails as a matter of law because plaintiffs have failed to demonstrate that Cohen Fox had a legal duty to any of the plaintiffs.  Smith v. Frandsen, 94 P.3d 919, 922 (Utah 2004) (in order to prevail on a theory of fraudulent concealment, "a plaintiff must demonstrate the existence of a duty running between the parties").  According to plaintiffs' allegations, as attorneys and officers of the court, Cohen Fox had a "duty to disclose the fraudulent nature of the Harrison and Robinson receiverships."  (Pls.' Mem. in Resp. at 22.)  At best, these facts show that Cohen Fox had a duty to the court and a duty to its client, which the Court has assumed for purposes of this motion is the Florida Fund.  These facts, however, are insufficient to demonstrate relationship between the *plaintiffs* and Cohen Fox that would result in a duty to disclose.  Because plaintiffs cannot demonstrate the existence of a duty running between the parties, the fraudulent concealment claim against Cohen Fox fails as a matter of law.

## SUMMARY & CONCLUSION

The plaintiffs' remaining claims against the Florida Fund and Cohen Fox suffer from one common flaw: the lack of facts.  While plaintiffs' counsel have skillfully mined all of the available evidence, and have argued vigorously to apply this mountain of facts to their legal claims, in the end there is simply an insufficient basis in fact to allow any remaining aspect of this case to go to a jury.

It is clear why plaintiffs want to obtain relief from the Florida Fund and Cohen Fox. Plaintiffs lost money at the hands of unscrupulous ATGF agents and they have exhausted, through settlement or otherwise, their ability to receive redress from the thieves themselves, ATGF, and the other defendants.  It is natural to want to achieve further recovery from the parent company, Florida Fund, and the law firm, Cohen Fox, closely associated with it.  In an effort to attach liability to these two entities, plaintiffs assembled an array of legal theories ranging from fraud and RICO, to conspiracy, to concealment, to breach of contract.  But by plaintiffs' counsel's admission, these various legal claims all depend upon some connection to the actual fraud perpetrators themselves, Messrs. Harrison, McAllister and Robinson.  In order to survive, these claims of liability against the Florida Fund and Cohen Fox need a sufficient association with the actions of the thieves themselves.  It is in this respect that the plaintiffs come up short.

As more fully addressed in this Court's earlier order, the Court has searched in vain throughout large volumes of plaintiffs' "facts" for credible evidence to support the proposition that the Florida Fund had sufficient knowledge of the fraudulent acts of the ATGF agents to support any of plaintiffs' claims against it.  Time after time, upon close examination – that is, by

going to the facts themselves, as cited in the plaintiffs' briefs, and carefully searching all of them, whether in deposition testimony or otherwise, to see if (a) they support the proposition for which they are cited and, if so, (b) to see if they have any real evidentiary value – plaintiffs' counsel's factual assertions have turned out to amount to nothing more than unfounded conjecture, insufficient to support an argument to a jury.  Whether in support of plaintiffs' RICO, conspiracy or alter ego claims, which were addressed in the June 25, 2007 Order, or the remaining tort, statutory and contract claims now before the Court, the result has always been the same: a paucity of supporting facts.

The unfortunate consequence of the actions of a handful of rogue agents is that dozens of people lost money.  And it is indisputably true that these fraud perpetrators were in a position to steal their clients' money because of their status as ATGF title insurance agents.  That allowed them to conduct their two primary fraud schemes: (1) enticing their clients to invest the money they received from the sale of real property into the agents' fraudulent investments (the so-called placement agreements) and (2) misrepresenting the status of their clients' mortgages (mortgage stacking).  Even so, these two principal types of fraud were not directly related to title insurance policies.  In the vast majority of the cases where clients lost money there was either no title insurance involved or there was no claim directly against an issued title insurance policy.  However, after a close examination of the entire factual record, it is apparent that plaintiffs' claims against the Florida Fund and Cohen Fox depend upon virtually nothing else besides the fact that the Florida Fund was involved in the title insurance business with its subsidiary, ATGF.

The Court sympathizes with the plaintiffs' losses and recognizes that apparently much of

them will go unsatisfied.  The main culprits are in prison, or are awaiting prison, and the claims

against the persons and entities directly connected with the perpetrators have been settled or

dismissed.  As to these remaining defendants, however, as described in this Opinion and Order,

there is an inadequate factual basis upon which to proceed.  The Florida Fund's motion for

summary judgment is granted.  (Dkt. No. 529.)  The Cohen Fox Defendants' motions for

summary judgment are granted.  (Dkt. Nos. 531 and 537.)  Plaintiff Chase Home Finance's cross

motion for summary judgment is denied.  (Dkt. No. 527.)

       Dated this 28th day of July, 2008.

_____
Dee Benson
United States District Court Judge